The PEOPLE of the State of
Colorado, Complainant,

v.

Peter S. RAZATOS, Attorney
Respondent.

No. 80SA249.

Supreme Court of Colorado,
En Banc.

June 22, 1981.

Rehearing Denied Aug. 6, 1981.

Philip A. Harley, Denver, for complainant.

Erick K. Furedy, Denver, Albert T. Frantz, Lakewood, for attorney respondent.

LOHR, Justice.

In proceedings before a hearing committee of the Grievance Committee of the Supreme Court, Peter S. Razatos, the respondent, was found to have engaged in acts of professional misconduct constituting cause for discipline under C.R.C.P. 241 B. The hearing committee has recommended as appropriate discipline that the respondent be suspended from the practice of law for

three years, that he make restitution to his client and that he be assessed the costs of the grievance proceedings. A hearing panel of the grievance committee approved the hearing committee's report and recommendations. The respondent filed numerous exceptions to the report of the hearing committee. Our review of the record persuades us that the material findings of fact reflected in that report are supported by clear and convincing evidence and that the recommendations for discipline are appropriate. Accordingly, we adopt those recommendations.

The respondent was admitted to the practice of law in Colorado on September 22, 1941. The conduct upon which these disciplinary proceedings are based took place in connection with the purchase of a bar by Dorothy Lee Smith in 1975. A summary of this complex matter is necessary to an understanding of the nature of the respondent's professional misconduct.

Smith had previously owned and operated bars and knew that the respondent was an attorney and a real estate broker and that he frequently represented parties in the purchase and sale of bars. He had performed legal services for her in 1969. Smith contacted the respondent in the spring of 1975 to see if he knew of any bars for sale. Smith decided not to purchase the first property to which the respondent referred her. Thereafter, upon his recommendation, Smith became interested in the Littleton Lounge and asked him to represent her in the purchase of that business.

The Littleton Lounge was closed at the time Smith became interested in buying it. The respondent told Smith that Apollo Stereo Music Company (Apollo) and Salem Investment Company (Salem), both of which he represented as an attorney, planned a foreclosure sale of the personal property of the Littleton Lounge and that

Smith could purchase the business and personal property free and clear of liens and encumbrances for $39,500. Smith agreed to do so and asked the respondent to represent her in the purchase. She knew that the respondent was the attorney for Apollo and Salem and thought he would be representing those corporations as well as herself.

The respondent prepared a receipt and option contract, which Smith signed,[1] to reflect the agreement. The respondent as "trustee" signed that contract as seller. The purchase price of $39,500 was to be paid $500 in cash and $39,000 by a promissory note (the $39,000 note). Payments to be made on the $39,000 note included monthly installments of $500. Smith also was to pay $8,000 on the $39,000 note upon sale of certain real property owned by her.

The respondent advised Smith that she should have another attorney prepare the documents for formation of a corporation to acquire and operate the business. Upon the respondent's suggestion, Smith engaged Black,[2] a young attorney who shared office space with the respondent, for that purpose. When Black was called into the respondent's office to meet Smith, Black assumed that the respondent was representing her as her lawyer. The respondent and Black had a fee sharing arrangement; the division of fees varied from case to case depending upon the degree of participation by each in the work performed. Smith did not know what the relationship was between the respondent and Black. Black performed the legal work which resulted in the formation of The Spigot, Inc. and consulted with the respondent concerning the licensing procedure and related matters.

The premises in which the Littleton Lounge was located were owned by the Pollacks. They held a promissory note with an unpaid balance of $9,895 made by a former owner of the lounge based upon the

---

1. The Spigot, Inc. was formed to act as purchaser. Smith signed some of the purchase documents on behalf of the corporation and in some instances also signed them individually. As the distinction between individual and corporate obligations is not of significance to the

issues before us, we refer generally to execution of documents by Smith without always specifying whether she signed individually or on behalf of The Spigot, Inc.

2. A fictitious name.

Pollacks' own earlier sale of the lounge. Before the Pollacks would agree to lease the premises to Smith, they required a promissory note in the amount of $9,895, secured by a lien on the fixtures, equipment and other assets to be acquired by Smith. Smith signed such a promissory note (the Pollack note) and security agreement after being assured by the respondent that it constituted part of the obligation to be reflected by the $39,000 note. The Pollack note required monthly payments of $413.72, and the respondent assured Smith that he would make those payments by use of the $500 monthly payments to be made by Smith on the $39,000 note. The Pollacks then leased the Littleton Lounge premises to The Spigot, Inc.

Apollo and Salem are subsidiaries of a common parent corporation. Apollo's business is the placement of cigarette, candy and amusement machines in bars. Salem is in the business of providing financing to bar owners who utilize Apollo's machines. Salem held a $5,874 promissory note from a former owner of the Littleton Lounge based upon such financing. Salem wished to obtain a new note from the purchaser of the lounge. Apollo wished to keep its machines in the lounge when it reopened.

Vechiarelli and others had owned the lounge at one time and held a promissory note in the amount of $22,552, secured by a lien on the physical assets of the lounge, as part of the proceeds of their sale of the lounge. In July of 1975 that note was in default and collection seemed extremely unlikely if not impossible. The respondent acquired that note based on an agreement to pay $3,000 cash upon Smith's purchase of the lounge, and to assign a $7,000 interest in the $39,000 note to Vechiarelli. The respondent agreed to pay $200 per month on the $7,000 obligation. He did not advise Smith of this transaction or of the Vechiarelli lien.

Prior to the closing on Smith's purchase of the Littleton Lounge, she executed the $9,895 Pollack note. At the closing she executed a $5,874 note to Salem (the Salem note) and the $39,000 note, payable to Apollo at the respondent's office. The $39,000 note was secured by a lien on the fixtures, equipment, and other assets of The Spigot, Inc.,[3] a conditional assignment of a secured promissory note with an unpaid balance of approximately $36,000 and other security. This latter note had been obtained by Smith as part of the sales price of another bar which she had owned earlier.

Although Apollo appeared as seller in the closing documents and payee on the $39,000 note, the only interest of Apollo and Salem in the transaction was in obtaining the new $5,874 promissory note and in keeping Apollo's machines in the lounge. Apollo had agreed with the respondent that he could keep any money he was able to obtain from the sale after applying the amounts necessary to pay creditors and to meet incidental expenses. Thus, the respondent had a financial interest in the transaction. He did not tell Smith of that interest.

All closing documents were prepared by the respondent and reviewed by Black. Although both the respondent and Black attended the closing, Black's participation was minimal.

The Pollack note, the Salem note and the $39,000 note contained no cross references reflecting that the obligations represented by the two smaller notes were part of the larger. Smith was left vulnerable to possible negotiation of the notes to persons having no knowledge of the true relationship of the debts reflected thereby, and a consequent increase of her obligation to the sum of the three notes. Although Smith asked the respondent why the $39,000 note was in the full amount notwithstanding the part payments reflected in the other two notes, she received no satisfactory answer.

The property which Smith acquired had an intrinsic value of much less than $39,000, a fact which the respondent knew but did not tell Smith.

3. The hearing committee found that the Salem note was secured by a lien on the machines and other equipment. Although the respondent's challenge to this finding may have some merit, the existence and scope of any such lien are not material.

After the closing, the respondent could expect to receive $500 per month from Smith on the $39,000 note and was obligated to pay $413.72 per month to the Pollacks and $200 per month to Vechiarelli.

Black and the respondent assisted Smith in obtaining or transferring the liquor license and in meeting legal difficulties resulting from alleged license violations after the closing. Black charged Smith for those services and split the fees equally with the respondent.

In January of 1976 the respondent negotiated a new loan of $2,500 to Smith from Salem. The original $5,874 Salem note was cancelled, and a new note for the increased loan was executed. The respondent co-signed the new note. The respondent kept the proceeds of the loan and credited Smith with the additional $2,500 as a payment on the $39,000 note. However, the interest rate on the Salem note was 18% in contrast to the 8½% interest rate on the $39,000 note. This was not explained to Smith. Smith obtained an additional $1,800 for her own use through a similar transaction in August of 1976. The respondent did not co-sign the new note reflecting the increased loan. As a result of the August transaction, the January 1976 note was cancelled, relieving the respondent of personal liability on that note.[4]

After the September 15, 1975 closing, Smith made the required $500 monthly payments except for a four month moratorium period to which the respondent agreed. No moratorium was obtained from the Pollacks. The respondent was frequently late in making the $413.72 monthly payments to the Pollacks and on several occasions did not make them. When payments were not received, the Pollacks complained to Smith; she referred them to the respondent; and the respondent advised the Pollacks that Smith's payments were late or that there was not enough money to go around.

In March of 1977, Black and the respondent terminated their relationship as a result of disagreements. In May of 1977, the respondent advised Smith in writing that he was no longer working on "her case." Black continued to represent Smith and as a result learned for the first time of the relationship of the three promissory notes. Black began to hold Smith's payments on the $39,000 note in his trust account pending a determination of how they should be disbursed, commenced certain litigation, and assisted Smith in initiating the request for investigation which resulted in these disciplinary proceedings.

After failing to receive scheduled payments, the respondent threatened foreclosure on the $39,000 note. He also suggested to the Pollacks that they threaten eviction because of failure of Smith to maintain insurance coverage on the leased premises, and they did so. In the meantime the Vechiarellis, who were not being paid on the respondent's $7,000 obligation, commenced litigation of their own, naming Smith and The Spigot, Inc. among the defendants. The respondent ultimately obtained settlement of this litigation by purchasing the $7,000 obligation from the Vechiarellis.

■ Smith agreed to sell the lounge business to another, and a closing was scheduled for May of 1978. Before the closing the respondent signed a statement of attorney's lien and caused it to be served on Smith and the prospective purchasers. The lien statement contained a claim for $5,000 in legal fees, based on the respondent's fee-sharing agreement with Black. The respondent had not previously billed Smith for that alleged obligation. Although neither Smith nor Black believed any fees were owed to the respondent, they agreed to pay and did pay the respondent the compromise amount of $2,500 to avoid jeopardizing the sale of the lounge. Thereafter, the sale of the business was completed and the various remaining claims were paid. The respondent had no legal basis for the assertion of a lien to secure a fee obligation even if any such obligation existed. *See* sections 12–5–119

---

4. The respondent asserts that the net result of the manner in which the $1,800 loan was treated was that the respondent ultimately bore the burden of that obligation. The evidence supports that assertion.

and 120, C.R.S.1973 (1978 Repl.Vol. 5), which were the asserted authorities for the claimed lien.

The hearing committee found that the respondent did not advise Smith of many of the pertinent matters relating to the transaction because of the respondent's personal financial interest in the sale.

In the proceedings before the hearing committee, the respondent was charged with professional misconduct in four separate counts. We summarize the committee's findings and conclusions with respect to each count individually.[5] The basic finding, from which the conclusion of misconduct flows, is that the relationship between the respondent and Smith in the purchase of the Littleton Lounge was that of attorney and client.

## COUNT I

Based on the charges in Count I, the respondent was found to have represented Apollo and Salem, whose interests were adverse to those of Smith, and to have retained a financial interest for himself in the sale, all without complete disclosure to Smith and without having obtained her informed consent. As a result, the hearing committee concluded that the respondent had violated DR5–101 (conflict between personal interests and client's interests), DR5–104 (entering into business transaction with client), DR5–105 (representing differing interests) as well as C.R.C.P. 241 B (conduct that violates the code of professional responsibility, accepted rules or standards of legal ethics or the highest standards of honesty, justice or morality).

## COUNT II

Count II involves the use of the three promissory notes without protective references reflecting that the smaller obligations were part of, and not additional to, the larger. The hearing committee found that this was done to make it difficult for Smith to understand the transaction and to hide

the respondent's profit interest in the transaction. The committee further found that because the combined installments (apparently including the $200 per month which the respondent was to pay toward Vechiarelli's $7,000 interest in the $39,000 note) exceeded the $500 per month which Smith had agreed to pay, she was subjected to harassment and litigation which caused her mental anguish, and financial detriment in the form of attorneys' fees. The committee concluded that these activities violated DR5–101(A) (conflict between lawyer's interests and client's interests), DR5–105, (representing differing interests), DR6–101(A) (neglect of a legal matter), DR7–101(A)(3) (prejudicing or damaging a client during the course of the professional relationship) and C.R.C.P. 241 B.

## COUNT III

Pursuant to Count III, the respondent was found to have a fiduciary relationship to Smith for the purpose of forwarding the payment of Smith's payments on the $39,000 note as necessary to meet the Pollack payments and was found to have violated that fiduciary responsibility by not making all payments to Pollack as Smith made her payments. Likewise, the respondent undertook the $200 per month Vechiarelli obligation without explaining to Smith that if the respondent did not make the required payments the business assets which Smith was purchasing were vulnerable to foreclosure to satisfy the Vechiarelli lien. By failing to make required payments, the respondent caused Smith to become embroiled in litigation. The committee also found that Smith was further prejudiced by the increased obligation resulting from the $2,500 increase of the Salem note in that the interest rates and monthly payments were increased. The hearing committee also found that the respondent benefited from that transaction. The committee concluded that these activities violated Rule DR1–102(A)(4) (engaging in conduct involving dishonesty, fraud, de-

---

**5.** Some of the charges, such as mishandling of trust funds, were found not to have been established. We do not summarize those charges.

ceit, or misrepresentation), DR5–101(A) (conflict between lawyer's interests and client's interests), DR5–104(A) (entering into business transaction with client), DR7–101(A)(3) (prejudicing or damaging a client during the course of the professional relationship), and C.R.C.P. 241 B.

### COUNT IV

Finally, based on Count IV, the respondent was found to have asserted an attorney's lien in circumstances where he had no statutory or legal foundation for a lien and had an uncertain claim to the fee on which the purported lien was founded. This conduct was found to have violated DR1–102(A)(4) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), DR1–102(A)(5) (engaging in conduct prejudicial to the administration of justice), DR1–102(A)(6) (engaging in conduct adversely reflecting on the attorney's fitness to practice law), and C.R.C.P. 241 B.

The hearing committee found all the conduct described to have been established by clear and convincing evidence. *See* C.R.C.P. 251 A.

The crux of the respondent's exceptions to the hearing committee's findings and conclusions is his claim that he was acting as a principal and as a broker and was never representing Smith as an attorney in the transactions. The committee found otherwise and our independent review of the record satisfies us that clear and convincing evidence supports the committee's finding.

The relationship of attorney and client is based upon contract; such a contract need not be express but can be implied from the conduct of the parties. *See Kurtenbach v. Tekippe*, Iowa, 260 N.W.2d 53 (1977); 7 *Am.Jur.2d* Attorneys at Law § 118 (1980).

Our review of the record reflects clear and convincing circumstantial evidence that the respondent was acting as Smith's attorney in the bar purchase transaction. That was the understanding of Smith and of the two attorney witnesses, Black and Pollack.

Only the respondent testified to the contrary. The conduct of the respondent and Smith was the source of the understanding of Black and Pollack as to the nature of the relationship. Any lingering doubt that the relationship was that of attorney and client is dispelled by the statement of attorney's lien signed by the respondent on April 25, 1978, in which it is stated:

"That the said attorney's lien is held for and on account of:

Dorothy Smith, Don Smith and Spigot, Inc. obtained the services of Peter Razatos as their attorney for legal matters, for incorporating and purchase of business, . . . commencing from September 15, 1975 until the present date."

The efforts of respondent to explain this statement away as a mistake are at best unconvincing. The attorney-client relationship having been established, it follows that the committee was correct in finding the numerous instances and types of professional misconduct summarized above.

We have considered all the exceptions of the respondent to the hearing committee's report and find them either without merit or directed to factual findings not material to the case.

The hearing committee recommended, and the majority of the hearing panel agreed, that a three-year suspension of the respondent's license to practice law and restitution of the $2,500 extracted from Smith by use of the purported attorney's lien would constitute appropriate discipline. The respondent has previously received a letter of reprimand from the Denver Bar Association Grievance Committee in 1966 and a letter of admonition from the Supreme Court Grievance Committee in 1971.

We have detailed the considerations relevant to lawyer discipline in other cases and will not repeat them here. *See, e. g., People v. Berge*, Colo., 620 P.2d 23 (1980). The misconduct which gave rise to the present proceedings was grievous, demonstrates insensitivity to the professional obligations of a lawyer and necessitates a severe sanction to reflect the gravity of the respondent's breach of ethical standards

and to protect the public from future unprofessional conduct of this kind. Accordingly, we adopt the recommendation of the committee.[6]

We order that Peter S. Razatos be suspended from the practice of law in the State of Colorado; that he comply with C.R.C.P. 255 within thirty days after the issuance of this opinion; that he not be permitted to apply for reinstatement for at least 3 years from the effective date of his suspension; and that before he will be reinstated he must demonstrate that he has complied with all applicable reinstatement rules and that he then possesses the requisite qualifications for readmission to the practice of law in Colorado.

It is further ordered that within 90 days of this order the respondent reimburse his former client Smith the sum of $2,500 plus interest at the legal rate from May 11, 1978[7] to the date of payment, without prejudice to the respondent's right to assert a claim for any unpaid share of legal fees owed to him by Black under their fee sharing arrangement.

It is further ordered that the respondent pay the costs of this disciplinary proceeding in the sum of $692.65 within 90 days from the date of this order.

---

6. We note that one member of the hearing panel wrote a separate recommendation strongly recommending disbarment.

7. The date of sale of the lounge by Smith and the payment of the fee to the respondent.