The PEOPLE of the State of
Colorado, Complainant,

v.

Douglas NUTT, Attorney-Respondent.

No. 82SA410.

Supreme Court of Colorado,
En Banc.

Dec. 17, 1984.

Linda Donnelly, Disciplinary Prosecutor, Denver, for complainant.

Merle R. Knous, Denver, for respondent.

NEIGHBORS, Justice.

This case involves a grievance proceeding brought against the respondent, Douglas Nutt. The Hearing Committee found that Nutt violated the Code of Professional Responsibility in two respects while representing his clients, William, Wilbur, and Robert Schawo. First, the committee determined that Nutt violated Disciplinary Rule 5–104(A) when he failed to disclose to his clients that he and his mother-in-law were the lenders involved in a $70,000 loan transaction between D.N. Associates and the Schawos, and that he received a $5,000 loan origination fee in connection with the matter. Second, the committee concluded that Nutt charged a clearly excessive fee contrary to Disciplinary Rule 2–106 when he (1) billed his clients for excessive time and for work not done, and (2) entered into a contingent fee contract under which the amount of fees that he was entitled to receive from his clients was related only to oil and gas royalties paid to them and not to the legal services provided. The Hearing Committee recommended a public censure. However, Hearing Panel "B" of the Grievance Committee recommended that Nutt be suspended from the practice of law for three months. The disciplinary prosecutor has urged this court to suspend the respondent for at least one year and one day.[1] In addition, the parties have each filed exceptions to the Hearing Panel's findings, conclusions, and recommendations.

I.

From our review of the record and the findings of the panel, we learn the following pertinent facts that provide the background for the specific findings upon which the recommendations for discipline are based.

William Schawo was an insurance salesperson. In 1976, his annual income was approximately $6,000 and his net worth was approximately $20,000. William and his wife lived in a mobile home on a 320-acre farm owned by the Schawos in Briggsdale, Colorado, and were in the process of building a permanent residence on the property. It was William's hope that he could engage in farming and ranching on a full-time basis.

Robert Schawo, William's brother, was employed as a truck driver for the Coors Brewery. His annual income in 1976 was approximately $17,000 and he had a net worth of approximately $24,000. Wilbur Schawo, the father of William and Robert, worked for the United States Postal Service. His income in 1976 was approximately $16,000 and his net worth was estimated to be $18,000.

Eva Daily, Wilbur's mother, was an elderly widow who owned a ranch in Western Kansas where she lived. In early 1976, oil and gas were discovered on her ranch. Daily communicated her desire to make a gift of some mineral rights to Wilbur.

As a result of these events, William contacted the respondent in February 1976. William met Nutt in 1975 when the respondent addressed a training session on estate planning for insurance salespersons.

Daily did not believe that Robert or William had the ability to manage their busi-

---

1. A lawyer who is suspended for less than one year is automatically reinstated to practice upon the filing of the affidavit prescribed by C.R.C.P. 241.22(b). However, a lawyer who is suspended for more than one year must petition the supreme court for an order of reinstatement in accordance with C.R.C.P. 241.22(c).

ness affairs properly. In addition, it was her wish to insulate any gifts or bequests to her grandsons from the possibility that they could be reached by their respective spouses.

The Schawos asked Nutt to verify the oil and gas discovery on the Daily Ranch and to investigate its significance. The respondent was also asked how to handle Wilbur's gift of mineral rights from his mother and how to structure the business affairs of William and Robert to encourage Daily to make gifts to them as well.

The respondent confirmed that oil and gas had been discovered on Daily's property. He reported his findings to the Schawos and told them that they would be facing serious income and death tax consequences.

Nutt worked on plans to resolve the Schawos' potential problems during March 1976. However, he learned that the Schawos had no income or assets with which to pay attorney's fees. As a result, a fee agreement was reached by the respondent and the Schawos. Under the terms of the agreement, Nutt had the responsibility for advising the Schawos with respect to all of their legal problems in exchange for a percentage of any oil and gas royalties they might receive. The agreement was signed by the respondent and the Schawos on March 25, 1976. Nutt advised the Schawos to consult with him on everything, not to sign any documents until first clearing them with him, and to call on him if they required money or if they wished to buy anything.

In March 1976, the Schawos needed $10,000 and reported this fact to the respondent. Nutt loaned the Schawos $10,000 and took a second mortgage on the Briggsdale property.

On March 29, 1976, the respondent mailed drafts of simple wills to William and his wife and informed them that the documents were only of an interim nature and that more extensive estate planning was necessary.

On April 9, 1976, Daily executed and delivered to Wilbur a deed to one-quarter of the minerals under the Daily Ranch. The mineral interest was conveyed to Wilbur for life with the remainder to William and Robert.

During the spring of 1976, William was unable to obtain a construction loan or permanent financing to complete building the house on the Briggsdale farm. William contacted Nutt and sought his help in obtaining such a loan. The respondent told William to obtain an estimate of the cost to complete construction. An estimate of $65,000 was provided. The respondent told the Schawos the loan would be difficult to procure and that a lender would require a $5,000 loan origination fee. Since the Schawos did not have such funds available, the respondent offered to advance the money and add the sum to the amount of the loan which would be sought.

The respondent and his mother-in-law, Ilse Diamant, decided to loan the Schawos the $70,000. A closing was scheduled for May 17, 1976, at the First National Bank of Fort Collins. The lender was identified at the closing only as "D.N. Associates." The respondent never advised the Schawos of the lenders' identity or obtained their informed consent to his personal involvement in the transaction.

In May 1976, Nutt presented the Schawos with a written memorandum in which he outlined his recommendations for resolving their legal and business concerns. The purpose of the memorandum was to persuade Daily that the Schawos could deal responsibly with any gifts they might receive from her. The respondent recommended that each of the Schawos form a wholly-owned corporation and that the capital stock of each corporation be placed into a single voting trust with the three Schawos as trustees. The respondent also recommended that post-nuptial agreements be signed by the Schawos and their respective spouses to avoid the risk of potential gifts from Daily falling into the wives' hands.

On June 7, 1976, the Schawos executed the incorporation documents, the twenty-

year voting trust agreement, and the post-nuptial agreements. Each of the Schawos' respective spouses also signed the post-nuptial agreements in which they waived any claims they might have to gifts or inheritances given to their husbands by Daily.

The respondent sent bills to the Schawos totalling $18,272.78 for legal services accrued as of July 1, 1976. The bills were based on the time expended by Nutt and his associate multiplied by their hourly rate of $40 per hour, plus a fee of $700 for preparation of the incorporation documents. Out-of-pocket costs were also billed to the Schawos. Upon receiving the bills, the Schawos reacted with alarm and immediately contacted the respondent. Nutt informed the Schawos that the bills were sent only to inform them of the extent of the services the respondent and his associates had performed to date. The respondent also sent a confirming letter which stated: "Please don't be alarmed at the size of the bills, as I am aware that we're waiting for royalty payments." During this time, the Schawos' confidence in the respondent was shaken. Later, in September 1976, the respondent discussed Wilbur's need for a $5,000 loan with the Schawos. Nutt advised the Schawos that Wilbur would be unable to obtain a loan without the respondent's co-signature. However, the Schawos went to a bank in Fort Collins and Wilbur was able to borrow the money on his own signature upon posting collateral.

Daily died on October 24, 1976. The following day, William and Robert Schawo met with Nutt and formally terminated him as their attorney. The communications between the Schawos and the respondent thereafter related primarily to attorney's fees. The respondent made requests for payments but the Schawos would not provide any information on the amount of oil and gas royalties they had received. The Schawos examined the respondent's time slips and offered to pay him $2,500 for his attorney's fees. The respondent refused the Schawos' settlement offer and made a counteroffer to arbitrate the fees. The Schawos refused.

On August 25, 1977, the respondent again billed the Schawos for $18,272.78 plus an additional $3,245 for services rendered after August 1976. Finally, on June 15, 1978, the respondent filed suit against the Schawos in the Arapahoe County District Court for the total billings of $21,517.78. The Schawos filed an informal complaint with the Grievance Committee against the respondent on October 20, 1978.

## II.

### FAILURE TO DISCLOSE

The respondent has filed exceptions to the findings that he failed to disclose to his clients that he and his mother-in-law were the lenders of a $70,000 loan, and that he received a $5,000 loan origination fee in connection with the transaction. Nutt argues that William and Wilbur Schawo knew or at least suspected that he was a lender on the construction loan. As support for his argument, respondent cites testimony in the record where he allegedly discussed the "terms" of the loan with William, the bank's business practice of disclosing the identity of the lenders in closing real estate loans, and admissions by Wilbur and William that at the closing they suspected that D.N. Associates was Douglas Nutt and saw a check for $5,000 made out to the respondent.

Disciplinary Rule 5–104(A) provides:

A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure.

The loan was to be repaid over thirty years and secured by a first deed of trust on the Briggsdale property. Although the stated interest was 12 percent per annum, the real interest rate on the loan was 13 percent per annum because $5,000 was paid to the respondent as a loan origination fee.

In addition, the respondent obtained $10,000 in repayment for the earlier loan. The loan proceeds were represented by two cashier's checks, one in the amount of $30,000 identifying Diamant as the remitter, and the other in the sum of $40,000 with no remitter identified. The lender was identified at the closing only as "D.N. Associates."

As a lender and a holder of a long-term mortgage on the property owned by his clients, respondent's interest in this transaction was necessarily adverse to the interests of his clients. *See People v. Razatos*, 636 P.2d 666 (Colo.1981), *appeal dismissed*, 455 U.S. 930, 102 S.Ct. 1415, 71 L.Ed.2d 639 (1982). Despite this conflict of interests, the respondent did not fully disclose to the Schawos that he was a lender and the extent to which his professional judgment concerning the property might have been influenced by his personal interest as a mortgagee. Nor did the respondent reveal to his clients that he stood to gain an immediate $5,000 profit on the transaction. *Id.;* C.P.R. DR5–101(A). The full disclosure requirement imposed by DR5–104(A) is the responsibility of the individual lawyer and cannot be discharged through the efforts of a third party, such as a closing agent or a bank. The attorney is not relieved of this responsibility when his clients suspect his involvement but elect not to confront him with their concerns.

The respondent also argues that his clients suffered no harm as a result of his failure to disclose and, in fact, received the benefits of a loan which no other lender would have made and which was made at terms very favorable to the Schawos. We agree with the Grievance Committee's determination that the terms of the loan were not unfair to the Schawos and that they were not injured. However, we rejected the "no harm—no foul" defense in *People v. Gibbons*, 685 P.2d 168 (Colo.1984). We stated: "We reject this theory of defense in a lawyer discipline proceeding. Assuming the client is not prejudiced by the lawyer's violation of the Code, that fact is only one of mitigation." 685 P.2d at 174.

The Grievance Committee properly concluded that respondent's failure to disclose to his clients that he and his mother-in-law were the lenders of the construction loan funds violated DR5–104(A).

## III.

## ATTORNEY'S FEES

### A.

### Excessive Fees

The Grievance Committee also found that the respondent billed the Schawos for excessive time for work done, and that he billed the Schawos for services not performed or work on matters unrelated to the Schawos' legal problems. After reviewing the record as a whole, we find the Committee's findings were supported by the evidence. *Gibbons*, 685 P.2d 168 (Colo.1984).

Disciplinary Rule 2–106 prohibits a lawyer from charging clearly excessive fees. The Code provides several factors that should be considered as guidelines in determining the reasonableness of a fee. Among those criteria are the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly. C.P.R. DR2–106(B)(1).

Respondent's time slips show that 32.5 hours were spent in researching, drafting, and conferences concerning the voting trust agreement. The Grievance Committee found that, "[t]he voting trust agreement is in fact taken nearly verbatim from [a form in] ... Rabkin & Johnson, *Current Legal Forms with Tax Analysis*. Furthermore, there is no evidence that respondent considered some of the obvious legal issues raised by the voting trust agreement." One of the more obvious questions concerning the agreement is the fact that the voting trust was created for a term of twenty years although the statutory limitation on voting trusts is ten years. § 7–4–117, 3 C.R.S. (1973).

In addition, the time slips show that 7.5 hours were spent in connection with the

$5,000 loan that Wilbur ultimately obtained without respondent's assistance. Nutt also billed the Schawos for approximately 12 hours of his time after he had been terminated by them.

Approximately 84 hours were billed for conferences with respondent's two partners, and 8 hours were billed for office planning and searching for an additional attorney to hire for the office, ostensibly to handle the anticipated business generated by the Schawos. However, respondent's partners testified that they never conferred with him regarding the Schawos' legal affairs and that they never completed time slips reflecting such conferences. In addition, they testified that it was not their practice to charge office planning and hiring matters directly to clients.

The Grievance Committee did not err in finding that the hours billed for projects completed by the respondent were excessive in relation to the time and labor required to properly deal with the questions involved. The evidence also clearly shows that respondent improperly charged the Schawos for services never performed or for time spent on matters unrelated to the Schawos' legal problems.

### B.

### Fee Agreement

The Grievance Committee found that the written fee agreement violated DR2–106, because there was no relationship between the fee charged and the work performed. The agreement stated in pertinent part:

The compensation that we anticipate for all legal services on an annual basis shall be in the range of $175,000 to $200,000. This original estimate is predicated upon a daily production of oil and gas wells on a ranch referred to as the Daily Ranch of Bucklin, Kansas, to be $4,000. Should the production increase or decrease, the amount of compensation shall appropriately increase or decrease.

The agreement did not contain a formula for calculating the fees but anticipated that the respondent's compensation would be 12 to 14 percent of any royalties received by the Schawos. The term of the agreement was for one year. The agreement was reviewable every six months and terminable by either party upon six months' written notice. We agree with the Grievance Committee that this fee agreement is contrary to the high ethical standards expected of the legal profession.

Fee arrangements between attorneys and clients are intended to compensate the lawyer for legal services rendered. *See* 7 Am.Jur.2d *Attorneys at Law* § 237, at 277 (1980) ("Lawyers are entitled to compensation for services rendered to their clients...."); C.P.R. EC2–16 ("The legal profession cannot remain a viable force in fulfilling its role in our society unless its members receive adequate compensation for services rendered, and reasonable fees should be charged in appropriate cases to clients able to pay them.").

■ Fees are either "fixed" or "contingent." C.P.R. DR2–106(B)(8). Throughout these proceedings, the parties and the Grievance Committee characterized the fee agreement here as a contingent fee contract.[2] Under a contingent fee contract, the attorney, if he is successful, receives for his services in litigating his client's cause a stipulated percentage or portion of the recovery. *See* 1 S. Speiser, *Attorney's Fees* § 2:1 (1973). This type of fee arrangement is generally valid in Colorado, *Bell v. Board of County Commissioners*, 26 Colo.App. 192, 141 P. 861 (1914), and C.P.R. EC2–20, except in criminal and divorce cases. *See* C.P.R. DR2–106(C); *Wall v. Lindner*, 159 Colo. 83, 410 P.2d 186 (1966). Nevertheless, contingent fee ar-

---

2. The fee agreement was "contingent" in the sense that the Schawos were required to pay attorney's fees only if they received oil and gas royalties from the wells on the Daily Ranch. However, it was different than the usual contingent fee contract under which the amount of

attorney's fees is dependent on the client's recovery achieved by way of settlement or trial of a litigated matter. The agreement was "fixed" to the extent that yearly attorney's fees of $175,-000 to $200,000 were anticipated.

rangements have long been recognized as a potential source of a conflict of interests for the attorney and, thus, attorneys may enter into such agreements "only in those instances where the arrangement will be beneficial to the client." *See* C.P.R. EC5–7.[3]

Under its general supervisory power over attorneys as officers of the court, a court may and should scrutinize contingent fee contracts and determine the reasonableness of their terms. *Anderson v. Kenelly,* 37 Colo.App. 217, 547 P.2d 260 (1975) (one-third contingent fee contract held unconscionable, unreasonable, and unfair, where dispute over payment of $26,373 in insurance proceeds was resolved in one week, and without litigation when the correct date of the decedent's enlistment in the military was discovered). *See also In re Estate of Reid,* 680 P.2d 1305 (Colo.App. 1983). A court reviewing such an agreement will test the contract against a *quantum meruit* standard and determine from all the facts and circumstances the amount of time spent, the novelty of the questions of law, and the risk of non-recovery to the client and attorney. *Bryant v. Hand,* 158 Colo. 56, 404 P.2d 521 (1965). The lawyer bears the burden of proving that the services to be performed were reasonably worth the amount stated in the agreement. *Id.*

In view of this judicial scrutiny the contingent fee percentage should not be fixed so high that "it ceases to be a measure of due compensation for professional services, and makes ... [the lawyer] a partner or proprietor in the lawsuit." 1 S. Speiser, *supra,* at 94.

In *Brillhart v. Hudson,* 169 Colo. 329, 455 P.2d 878 (1969), this court addressed the requirements that there be both a reasonable correlation between the amount of the contingent fee and the services provided, and that those services be legal in nature. In *Brillhart,* the attorney and his client agreed that the attorney would receive a 25 percent "contingent fee" if he found a purchaser for his client's leasehold and equipment. The court characterized the fee as "a broker's commission" disguised as a contingent fee contract for legal services. The court refused to enforce the agreement and awarded the attorney fees based only upon the reasonable value of legal services rendered to his client.

Nutt entered into a fee arrangement in which his compensation was directly related only to the royalties his clients might receive from oil and gas wells. He estimated his annual compensation to be between $175,000 and $200,000. For a share of his clients' royalty payments, the respondent agreed to be responsible for all his clients' legal problems. Even using his own inflated records, the respondent's legal services during his eight-month employment was valued at $18,272.78, yet the respondent was ready to accept as much as $200,000 in compensation. It is clear that this fee agreement was not intended as compensation for legal services, but was designed to buy the respondent a stake in the speculative returns of the oil and gas discovery, much like the purchase of a lottery ticket. Any fee he might have received from such a royalty-sharing agreement would not have been indicative of the time, labor, and skill invested by the respondent and, therefore, this fee agreement, whether labeled fixed or contingent, is forbidden by the provisions of DR2–106 because it authorized the collection of clearly excessive fees.

## IV.

### DISCIPLINE

The respondent was admitted to practice law as a member of the bar of this court on October 1, 1971. He is registered as an attorney with this court and, therefore, is subject to our jurisdiction. The respondent received a letter of admonition from the Grievance Committee in 1979 for charging a clearly excessive fee in connection with his representation of a decedent's estate.

3. Contingent fee arrangements serve a necessary purpose in providing a means by which a person of modest financial resources may secure competent legal representation to prosecute his claim in certain kinds of litigation. *See* S. Speiser, *supra,* § 2:2; C.P.R. EC2–20.

As we noted earlier, the hearing committee recommended that a public censure be imposed. The respondent has not taken exception to a public censure for his conduct. However, the Grievance Committee has recommended a suspension for three months. Such disciplinary recommendations are advisory only and are not binding on this court. *E.g., Gibbons,* 685 P.2d 168 (Colo.1984); *People v. Mattox,* 639 P.2d 397 (Colo.1982).

The respondent's violation of the Code, coupled with his prior discipline for conduct involving an attempt to collect a clearly excessive fee, lead us to conclude that suspension is the appropriate discipline. In view of the fact that the rights of the respondent's clients were not substantially harmed, we fix the period of suspension at six months. The respondent's overzealous efforts to charge excessive fees to his clients constitute an unacceptable pattern of unprofessional conduct and are contrary to the high standards of honesty, justice, and morality expected of lawyers. Accordingly, the respondent, Douglas Nutt, is suspended from the practice of law for a period of six months in accordance with C.R.C.P. 241.21(a) and is ordered to comply with the requirements of C.R.C.P. 241.21. He is further ordered to pay the costs of this proceeding in the amount of $5,466.67 within ninety days from the date of this order.