The PEOPLE of the State of
Colorado, Complainant,

v.

Bernard D. MORLEY,
Attorney-Respondent.

No. 85SA339.

Supreme Court of Colorado,
En Banc.

Sept. 15, 1986.

Linda Donnelly, Disciplinary Prosecutor, George S. Meyer, Deputy Disciplinary Prosecutor, Denver, for complainant.

Bernard D. Morley, P.C., Robert K. Reimann, Denver, for attorney-respondent.

QUINN, Chief Justice.

A complaint was filed with the Grievance Committee charging the respondent, Bernard D. Morley, with professional misconduct. A hearing board of the Grievance Committee found that the respondent had violated the Code of Professional Responsibility and the Colorado Rules Regarding Lawyer Discipline and recommended that the respondent be disbarred. A hearing panel of the Grievance Committee approved the findings and recommendation of the hearing board. We conclude that the respondent's professional misconduct constituted such a flagrant violation of professional ethics as to warrant the severe sanction of disbarment.

## I.

The respondent was licensed to practice law in Colorado in 1958 and is subject to the jurisdiction of this court and its Griev-

ance Committee. In 1980 the Cherry Hills Police Department received information from the respondent's former housekeeper that he was using cocaine. As part of their investigation of the respondent's drug use, undercover police officers attempted to purchase cocaine from him on two separate occasions but without success. The Cherry Hills Police Department thereafter sought investigative assistance from the Arapahoe County Special Crime Attack Team (SCAT) concerning the respondent's alleged violation of Colorado's drug laws. Due to jurisdictional and financial limitations, the director of SCAT requested further assistance from the Federal Bureau of Investigation (FBI).

The FBI was primarily interested in developing information concerning a male person we hereafter refer to as H.L., one of the respondent's clients, whom the FBI suspected of income tax evasion and the violation of other federal laws. H.L. had an ownership or other interest in several topless-bottomless bars in the Denver area and had employed a number of dancers to work in these bars. Hoping that the respondent would be a conduit to H.L., the FBI and SCAT set up a so-called "sting" operation.

On July 22, 1980, a female informant, whom we will call S.N., contacted the respondent in his office and spoke to him concerning the establishment of a female escort service in the Denver area. The respondent advised S.N. about the licensing requirements of the newly enacted Colorado Escort Service Code, §§ 12–25.5–101 to –115, 5 C.R.S. (1985), and specifically told her not to apply for a license under the statute if the service was to be used as a front for prostitution. S.N. paid the respondent $100 for the July 22 consultation.

On August 8, 1980, S.N. and FBI agent Charles Evans met with the respondent in his office. Evans told the respondent that he was from the east coast and was a member of an organization that was attempting to establish a prostitution service in Denver to serve wealthy travelers from the New York area. Evans further explained that the persons served by his organization had minimum annual incomes of two hundred thousand dollars, that the organization's clients were provided with computerized monthly billings for services rendered, and that the organization hoped to have a base of fifty women in Denver who would serve at least two hundred clients a month at $300 per hour. Evans told the respondent that his legal services were not needed, but that he had been contacted as someone who could put the organization in touch with other persons who could provide prostitutes for the scheme.

The respondent refused Evans' offer of a financial interest in the proposed venture and stated that all his work for the organization would be billed as legal work. He discussed with Evans the importance of setting up a code system for the women, commented on the dangers of using an out-of-house computer service, and stated that putting the initial money to fund the operation in the respondent's trust account rather than a bank account would assure Evans a degree of anonymity with respect to his role in the scheme. After commenting on the method used to screen the women employed in the scheme, the respondent cautioned Evans against advertising and the use of pimps. No definite agreement was reached on a fee, although the respondent did mention to Evans that at his first meeting with S.N. he had told her he would require a $1,000 retainer. After the scheme was outlined, the respondent told Evans he would consider different ways in which to put the service together and would make some contacts. At this meeting and in later conversations, the respondent also advised Evans about various ways to structure the proposed activity in order to avoid problems with local law enforcement agencies.

On September 3, 1980, the respondent arranged for agents Evans and Kazmier, who also was posing as a member of Evans' organization, to meet H.L. at dinner. The record does not indicate that anything of significance transpired at the dinner

meeting with H.L. The following day, September 4, the respondent again met with the agents and proposed that he be paid a fee of $5,000 for providing the organization with contacts. The respondent again met with the agents in his office on September 30, when he received a $1,000 payment from Kazmier. It was agreed at this meeting that the respondent would provide additional contacts and that he would receive $1,500 payable in two to three weeks with the balance of $2,500 payable once the prostitution business was in operation. Until September 30 the respondent kept a record of his meetings with S.N. and the agents on a ledger sheet titled in S.N.'s name. The respondent entered these meetings on the ledger sheet as conferences with "clients."

On October 16, 1980, the respondent met again with agent Kazmier and provided him with the names and telephone numbers of two women to contact in connection with the prostitution operation. At a final meeting with agent Evans on December 1, 1980, the respondent indicated that he was displeased because the organization had failed to meet the schedule of payments agreed upon at the September 30 meeting.

Unknown to the respondent, the conversations he had with S.N. and the undercover agents had been recorded. On November 19, 1981, the respondent was charged in the Arapahoe County District Court with soliciting for prostitution, § 18–7–202, 8 C.R.S. (1978), pandering, § 18–7–203(1)(b), 8 C.R.S. (1978), and conspiracy to commit these offenses, § 18–2–201, 8 C.R.S. (1978). For reasons not set forth in the record before us, these charges were dismissed on January 7, 1983.

On October 24, 1983, a formal complaint was filed with the Grievance Committee, charging the respondent with professional misconduct in several particulars, including as pertinent here: violating the highest standards of morality in violation of C.R. C.P. 241.6(3); engaging in conduct adversely reflecting on his fitness to practice law in violation of DR 1–102(A)(6); assisting a client in conduct that the lawyer knows to

be illegal in violation of DR 7–102(A)(7); and knowingly engaging in other illegal conduct or conduct contrary to a disciplinary rule in violation of DR 7–102(A)(8).

The respondent moved to dismiss the charges or in the alternative to suppress the tape recordings of his conversations with S.N. and the undercover agents, as well as any testimony concerning these conversations, on the basis that the entire investigation was instituted and conducted in an outrageous manner and in bad faith in violation of due process of law. The board expressed some reservations about the propriety of the agents' conduct, but concluded that the investigation was not conducted outrageously or in bad faith and therefore denied the motion.

The case against the respondent consisted primarily of the tape recorded conversations with S.N. and the FBI agents. The respondent testified that he knew from the first meeting with Agent Evans that an illegal prostitution scheme was being planned. He acknowledged that he made no attempts to dissuade Evans and Kazmier from engaging in the proposed illegal activity, but he asserted that he had not given them any legal advice. The respondent told the hearing board that he accepted the payment of $1,000 for the time he had already spent with the agents, but stated that he gave the agents the names of the two women and introduced them to H.L. only in order to "string them along" because he believed that they would require his legal services in the future.

The hearing board found by clear and convincing evidence that the respondent's counseling of activities which he acknowledged to be criminal was not consistent with the highest standards of morality and thus violated C.R.C.P. 241.6(3). The board also found by clear and convincing evidence that the respondent violated the Code of Professional Responsibility in the following particulars: engaging in conduct that adversely reflected on the respondent's fitness to practice law in violation of DR 1–102(A)(6); counseling or assisting a client in conduct that the respondent knew to be

illegal in violation of DR 7–102(A)(7); knowingly engaging in illegal conduct or conduct contrary to a Disciplinary Rule in violation of DR 7–102(A)(8).[1] While the board acknowledged that the respondent had not been previously adjudged guilty of professional misconduct, it recommended the sanction of disbarment due to the serious and continuing nature of his professional misconduct in this case. The hearing panel of the Grievance Committee approved the findings and conclusions of the board and adopted the board's recommendation of disbarment.

The respondent has filed exceptions to the hearing panel's report. He contends that the undercover investigation constituted outrageous conduct and was conducted in bad faith in violation of due process of law, U.S. Const. amend. XIV; Colo. Const. art. II, sec. 25, thereby requiring either the dismissal of grievance charges or the suppression of the evidence obtained during the investigation; that C.R.C.P. 241.6(3) (act violative of highest standards of morality) and DR 1–102(A)(6) (conduct adversely reflecting on lawyer's fitness to practice law) are unconstitutionally vague in violation of due process of law under the United States and Colorado Constitutions; that the lack of specific guidelines for imposing discipline under the Colorado Rules Regarding Lawyer Discipline (C.R.C.P. 241.1 to 241.7) renders these rules unconstitutionally vague in violation of due process; that the record does not adequately support a violation of DR 7–102(A)(7) (assisting a client in illegal conduct) or DR 7–102(A)(8) (illegal conduct or conduct violative of a disciplinary rule) because there was no evidence of an attorney-client relationship between the respondent and the undercover agents; that the board violated the respondent's

due process rights by refusing to allow a retired judge to testify as a character witness at the grievance proceedings; and that the sanction of disbarment is excessive.

## II.

We first address the respondent's due process claim that the undercover operation constituted outrageous conduct and was conducted in bad faith in violation of due process of law. We are unpersuaded by the respondent's claim.

In a disciplinary proceeding, the court's primary duty is to protect the public and the legal profession from unscrupulous lawyers. *People v. Harfmann,* 638 P.2d 745, 747 (Colo.1981). Disciplinary proceedings are *sui generis* in nature, and conviction of a criminal offense is not a condition precedent to the institution of such proceedings nor does an acquittal constitute a bar to such proceedings. *Harfmann,* 638 P.2d at 748; *see also* C.R.C.P. 241.6(5); *People v. Mead,* 29 Colo. 344, 68 P. 241 (1902). While a lawyer is entitled to procedural due process in such a proceeding, there is no requirement that he be afforded the same constitutional safeguards applicable to a criminal trial. *Harfmann,* 638 P.2d at 747; *see In re Ruffalo,* 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968); *Emslie v. State Board of California,* 11 Cal.3d 210, 520 P.2d 991, 113 Cal.Rptr. 175 (1974). Unlike the rule applicable to a criminal proceeding, evidence of professional misconduct obtained by law enforcement officers should be admissible at a disciplinary proceeding unless the officers themselves engaged in outrageous misconduct or acted in bad faith in obtaining the challenged evidence. *Harfmann,* 638 P.2d at

---

1. The grievance complaint also charged the respondent with violating the criminal laws of the state with respect to prostitution in contravention of C.R.C.P. 241.6(5) and with engaging in conduct involving dishonesty in violation of DR 1–102(A)(4). The hearing board concluded, however, that it had not been shown by clear and convincing evidence that the respondent violated the criminal laws of the state or that he engaged in dishonest conduct. In the board's

view, the only evidence of dishonesty was the respondent's testimony that he was "stringing along" undercover agents who solicited the respondent's advice and assistance in establishing an illegal prostitution service. The board chose not to believe the respondent's testimony in that respect. The Disciplinary Prosecutor has not filed exceptions to these aspects of the board's ruling, and we do not address them in this opinion.

748; *see People v. Ressin,* 620 P.2d 717 (Colo.1980). If the governmental officials acted outrageously or in bad faith in obtaining the challenged evidence, then due process of law requires the exclusion of such evidence or perhaps the even more drastic remedy of dismissal. There is no "bright line" or "per se" rule in this area of the law, and each case must be decided on the basis of its own peculiar facts. *Harfmann,* 638 P.2d at 748; *see Emslie,* 11 Cal.3d 210, 520 P.2d 991, 113 Cal.Rptr. 175.

■ While we accept the hearing board's finding that the investigation was initiated and conducted without any actual knowledge or belief that the respondent was involved in prostitution-related activities, we are satisfied that the undercover operation did not reach the level of outrageous or bad faith conduct necessary to support the sanction of dismissal or suppression. Several factors lead us to this conclusion. First, the undercover operation was the result of the separate but somewhat related interests of two law enforcement agencies: SCATS' interest in investigating the respondent's alleged illegal drug activity and the FBI's interest in developing information about H.L.'s alleged criminal conduct. Both interests were within the ambit of legitimate law enforcement activities. While the undercover operation was itself built on deceit, governmental activity in the pursuit of crime "is not confined to behavior suitable for the drawing room." *United States v. Murphy,* 768 F.2d 1518, 1529 (7th Cir.1985); *see United States v. Qaoud,* 777 F.2d 1105 (6th Cir.1985), *cert. denied,* ── U.S. ──, 106 S.Ct. 1499 (1986). Second, the respondent, from his initial contact with the agents, eagerly offered for sale his counsel and assistance in the formation of an illegal enterprise. The respondent's decision to engage in this conduct was made freely and knowingly, out of an obvious predisposition to do so, and not as the result of some overbearing inducement by the federal agents. *See Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976); *Evans v. People,* 706 P.2d 795 (Colo.1985); *Bailey v. People,* 630 P.2d

1062 (Colo.1981). Third, the tape recordings of the respondent's conversations were made in each instance with the consent of the other parties to the conversations, S.N. and the undercover agents, and were not procured by any unconstitutional invasion of the respondent's privacy. *E.g., United States v. White,* 401 U.S. 745, 91 S.Ct. 1122 (1971); *People v. Velasquez,* 641 P.2d 943 (Colo.1982), *cert. denied,* 459 U.S. 805, 103 S.Ct. 774, 74 L.Ed.2d 986 (1982). Fourth, there is no evidence that the undercover agents were pursuing a course of harassment or engaging in gross improprieties during their contacts with the respondent. *See Ressin,* 620 P.2d 717. Finally, contrary to the respondent's assertion, the record fails to demonstrate that the undercover operation involved an intrusion into an attorney-client relationship between the respondent and H.L. The evidence of the respondent's misconduct basically consisted of the respondent's conversations with S.N. and the agents and was thus developed separately from any lawyer-client relationship that might have existed between the respondent and H.L.

Since the record fails to demonstrate that the conduct of the undercover agents was violative of due process of law, *e.g., United States v. Kelly,* 707 F.2d 1460 (D.C.Cir. 1983); *United States v. Jannotti,* 673 F.2d 578 (3d Cir.1982), *cert. denied,* 457 U.S. 1106 (1982), it was proper for the hearing board to consider the evidence obtained in the course of the undercover operation.

### III.

■ We turn to the respondent's claim that C.R.C.P. 241.6(3) and DR 1–102(A)(6) are unconstitutionally vague in violation of due process of law. C.R.C.P. 241.6(3) provides as follows:

> Misconduct by a lawyer, individually or in concert with others, including the following acts or omissions, shall constitute grounds for discipline, whether or not the act or omission occurred in the course of an attorney-client relationship:
>
> \* \* \* \* \* \*

Any act or omission which violates the highest standards of honesty, justice, or morality.

DR 1–102(A)(6) states that "[a] lawyer shall not ... [e]ngage in any other conduct that adversely reflects on his fitness to practice law." Specifically, the respondent argues that the phrases "the highest standards of ... morality" in C.R.C.P. 241.6(3) and "conduct that adversely reflects on his fitness to practice law" in DR 1–102(A)(6) fail to advise lawyers of the type of conduct that is prohibited and require those who enforce the provisions to guess at their meaning and thus differ as to their application. We find no merit in the respondent's argument.

The same basic standards applicable to determining a constitutional challenge to a statute should guide our resolution of the respondent's due process challenge to C.R.C.P. 241.6(3) and DR 1–102(A)(6). *See Committee on Professional Ethics v. Durham,* 279 N.W.2d 280 (Iowa 1979). There is a presumption of constitutionality attaching to such enactments, and the burden is on the party challenging an enactment to demonstrate its unconstitutionality beyond a reasonable doubt. *E.g., Kibler v. State,* 718 P.2d 531 (Colo.1986); *Colorado Auto & Truck Wreckers v. Department of Revenue,* 618 P.2d 646 (Colo.1980). Since a disciplinary rule is promulgated for the purpose of guiding lawyers in their professional conduct, and is not directed to the public at large, the central consideration in resolving a vagueness challenge should be whether the nature of the proscribed conduct encompassed by the rule is readily understandable to a licensed lawyer. *E.g., Matter of Keiler,* 380 A.2d 119 (D.C.App. 1977); *Committee on Professional Ethics,* 279 N.W.2d 280 (Iowa 1979); *Matter of Sekerez,* 458 N.E.2d 229 (Ind.1984), *cert. denied,* 469 U.S. 856, 105 S.Ct. 182, 83

L.Ed.2d 116 (1984); *Complaint of Rook,* 378 Or. 695, 556 P.2d 1351 (1976).[2]

■ When C.R.C.P. 241.6(3) and DR 1–102(A)(6) are measured by the "licensed lawyer" standard, we are convinced that these disciplinary proscriptions are adequate to inform the respondent and other licensed lawyers of the nature of the prohibited conduct and that they provide sufficiently clear norms of conduct for the objective administration of the disciplinary process. Counseling another in illegal conduct is itself prohibited by law. *See, e.g., People v. Silvola,* 195 Colo. 74, 575 P.2d 413 (1978); *People v. Salazar,* 185 Colo. 331, 524 P.2d 298 (Colo.1974); *see also Office of Disciplinary Counsel v. Campbell,* 345 A.2d 616 (Pa.1975). It requires little imagination to conclude that any practicing attorney would know that counseling illegal activity is a violation of the highest standards of morality and reflects adversely on that lawyer's fitness to practice law. In short, we conclude that C.R.C.P. 241.6(3) and DR 1–102(A)(6) are not unconstitutionally vague on their face or as applied to the respondent under the circumstances of this case.

## IV.

■ The respondent next argues that C.R.C.P. 241.1 through 241.7 are unconstitutionally vague in violation of due process of law because they fail to set forth specific guidelines for the imposition of discipline. Rules 241.1 through 241.5 set forth the policy considerations and procedures to be utilized in the imposition of discipline; rule 241.6 states the grounds for which an attorney may be disciplined, and rule 241.7 contains the forms of discipline which may be imposed in those cases where grounds for discipline have been established. We

---

**2.** We have recognized a distinction between standards of conduct imposed upon professionals and those imposed upon lay persons. *See, e.g., Kibler v. State,* 718 P.2d 531, 534–35 (Colo. 1986) (registered nurse is required to exercise that degree of knowledge, skill, and care exercised by other like professionals in the same or a similar community); *LDS, Inc. v. Healy,* 197

Colo. 19, 589 P.2d 490 (1979) (a licensed real estate developer having a personal and confidential relationship with members of the public is to be held to a higher standard of conduct than the normal business person); *Weissman v. Board of Education,* 190 Colo. 414, 547 P.2d 1267 (1976) (a teacher may be held to a higher standard of conduct than a lay person).

are satisfied that the rules challenged here provide sufficient guidelines for the imposition of attorney discipline.

We recently held that a statute passes constitutional muster for purposes of imposing professional discipline if it prescribes the possible penalties that can be imposed for a violation of a statutory proscription. *Kibler,* 718 P.2d 531. We see no reason to apply a different standard to judicially promulgated rules for disciplining attorneys. The sanctions set forth in C.R. C.P. 241.7 include disbarment, suspension, public censure, private censure, and letter of admonition. While the rule permits a great deal of discretion in deciding which penalty to impose, such discretion is necessary to allow the Grievance Committee and ultimately this court to fashion appropriate sanctions for the myriad forms of professional activity which might result in professional misconduct. We thus conclude that the rules challenged by the respondent are not unconstitutionally vague.

### V.

■ We now turn to the respondent's contention that the record does not contain sufficient evidence to support the hearing board's finding that an attorney-client relationship existed between the respondent and the undercover agents, including S.N., and that the board consequently erred in concluding that the respondent violated DR 7–102(A)(7) and DR 7–102(A)(8). We find no merit in the respondent's claim.

DR 7–102(A) provides in pertinent part:
 In his representation of a client, a lawyer shall not:

 . . . . .

 (7) Counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent.
 (8) Knowingly engage in other illegal conduct or conduct contrary to a Disciplinary Rule.

DR 7–102(A) clearly requires the existence of an attorney-client relationship as an essential element of the professional miscon-

duct therein proscribed. A client is a person who employs or retains an attorney for advice or assistance on a matter relating to legal business. *Black's Law Dictionary* 230 (rev. 5th ed. 1979); *In re O'Byrne,* 298 Or. 535, 694 P.2d 955 (1985). The relationship of attorney and client can be inferred from the conduct of the parties. *People v. Razatos,* 636 P.2d 666 (Colo.1981), *appeal dismissed,* 455 U.S. 930, 102 S.Ct. 1415, 71 L.Ed.2d 639 (1982); *Matter of Adoption of Baby Boy Irons,* 235 Kan. 540, 684 P.2d 332 (1984); *In re O'Byrne,* 298 Or. 535, 694 P.2d 955. The relationship is sufficiently established when it is shown that the client seeks and receives the advice of the lawyer on the legal consequences of the client's past or contemplated actions. *See Denver Bar Association v. Public Utilities Commission,* 154 Colo. 273, 391 P.2d 467 (1964); *Matter of Adoption of Baby Boy Irons,* 235 Kan. 540, 684 P.2d 332; *In re O'Byrne,* 298 Or. 535, 694 P.2d 955.

We are satisfied that a sufficient legal relationship existed between the respondents and the governmental agents, including S.N., to render the respondent's conduct subject to the provisions of DR 7–102(A). Despite the fact that the primary purpose of the undercover operation was to engage the respondent's services in providing contacts to persons who could procure women for the proposed illegal business, the record amply demonstrates that at various times during the relationship S.N. and the undercover FBI agents requested and received advice of a legal nature regarding the consequences of their illegal proposal. At the first meeting with the respondent, S.N. received and paid for advice concerning the newly enacted Colorado Escort Service Code, §§ 12-25.5-101 to –115, 5 C.R.S. (1985). In subsequent meetings and conversations with FBI agents Evans and Kazmier, the respondent gave advice about structuring the prostitution scheme in a manner that would avoid legal complications with local authorities. Moreover, the respondent charged S.N. and the undercover agents for his services and entered these services in his office records as conferences with "clients." We conclude, therefore,

that the evidence is sufficient to establish a violation of DR 7–102(A)(7) and DR 7–102(A)(8).

## VI.

 The respondent next claims that the hearing board violated his due process rights by refusing to permit a retired judge to testify as a character witness in his behalf. We find the respondent's claim devoid of merit.

We acknowledge that the right to call witnesses in one's defense is a basic tenet of due process. *E.g., People v. Hampton,* 696 P.2d 765 (Colo.1985); *People v. District Court,* 192 Colo. 480, 560 P.2d 463 (1977). Under the principles announced in *Harfmann,* 633 P.2d 745, this right extends to an attorney facing disciplinary charges. This right, however, is not absolute. Due process does not vest a respondent in a disciplinary proceeding with a right to call any and all witnesses or elicit any testimony whatever; so long as the respondent is accorded a full and fair opportunity to present a defense to the charge, the tribunal hearing the case is entitled to exercise a sound discretion in limiting the type of evidence and the number of witnesses offered at the hearing. *E.g. Potts v. People,* 114 Colo. 253, 158 P.2d 739 (1945).

In this case, the respondent was permitted to call two witnesses, a former client and a fellow lawyer. Each testified as to his good character and his abilities as an attorney. Nothing in the record before us or in the respondent's offer of proof indicate that the retired judge's testimony would have differed significantly in content from the testimony of the other two character witnesses. Under these circumstances, we cannot say that the respondent's due process rights were violated by the board's refusal to permit the retired judge to testify as a character witness in the respondent's behalf.[3]

## VII.

Finally, the respondent argues that the sanction of disbarment is excessive under the circumstances of this case. We disagree.

 C.R.C.P. 241.15(b)(3) provides that, after reviewing the hearing board's findings, the hearing panel shall refer the matter to this court and recommend an appropriate form of discipline. Since the panel's disciplinary recommendation is advisory only and not binding on this court, *People v. Nutt,* 696 P.2d 242 (Colo.1984); *People v. Gibbons,* 685 P.2d 168 (Colo.1984); *People v. Mattox,* 639 P.2d 397 (Colo.1982), we must make an independent decision regarding the appropriate form of discipline suited to the circumstances of the particular case.

The respondent in this case knowingly counseled what he believed was an illegal

---

**3.** The hearing board relied on Canon 2 B of the Code of Judicial Conduct and *Matter of Thomason,* 304 S.E.2d 821 (S.C.1983), in refusing to allow the retired judge to testify as a character witness in behalf of the respondent. Canon 2 B provides in part that "[a judge] should not testify voluntarily as a character witness." The rationale for the rule is set out in the commentary to Canon 2 B: "The testimony of a judge as a character witness injects the prestige of his office into the proceeding in which he testifies and may be misunderstood to be an official testimonial." In *Thomason,* the South Carolina Supreme Court, relying on Canon 2 B, held that a judge may never testify as a character witness in a disciplinary proceeding because the danger that such testimony may be given undue weight is "[e]specially ... true in a disciplinary proceeding where the Hearing Panel is composed of lawyers." 304 S.E.2d at 823. The hearing board found this reasoning persuasive and ruled that the proffered witness, who was sitting as an active judge under the senior judge program at the time of the proceedings in question, should not be permitted to testify as a character witness.

While we agree that it is generally improper for a judge to testify voluntarily as a character witness at an attorney disciplinary proceeding, we note in passing that there might be exceptional circumstances that render it appropriate to permit a judge to testify, such as where the judge is the *only* available character witness. We also note, however, that it is within the discretion of the hearing board to consider the rationale of Canon 2 B—that a judge's testimony may unfairly inject the prestige of his office into the proceedings—in determining whether to permit the judge to testify as a character witness under these exceptional circumstances.

prostitution scheme, and he actively pursued participants for that purpose. The respondent's misconduct was nothing short of a calculated effort to assist others in this ostensibly illegal enterprise, was undertaken over a considerable period of time for his own profit, and could not have been accomplished without an egregious disregard of basic professional ethics. As such, the respondent's actions were the very antithesis of the most rudimentary moral standards that the public has the right to expect of a lawyer.

We recognize that the undercover agents had little or no reason to suspect the respondent of prostitution-related activities and that the respondent has not been previously disciplined by this court. While these factors might well serve to mitigate less reprehensible conduct than that present here, they are of no avail in this case. A lawyer's use of his license to practice law for the purpose of bringing into being an illegal prostitution enterprise renders disbarment the only possible form of discipline available to us. Any lesser sanction would unduly depreciate the seriousness of the respondent's misconduct in the eyes of both the public and the legal profession.

The respondent is accordingly disbarred, and his name is to be stricken from the roll of attorneys licensed to practice law in this state. The respondent is further ordered to pay the costs of these proceedings in the amount of $2,199.54 by tendering this sum to the Supreme Court Grievance Committee within sixty days of this date.

LOHR, J., does not participate.