The PEOPLE of the State of Colorado, Petitioner

v.

Mark Joseph GABRIESHESKI, Respondent.

No. 08SC945.

Supreme Court of Colorado, En Banc.

Oct. 24, 2011.

Daniel H. May, District Attorney, Fourth Judicial District, Doyle Baker, Deputy District Attorney, Colorado Springs, Colorado, Attorneys for Petitioner.

McClintock & McClintock, P.C., Elizabeth A. McClintock, Theodore P. McClintock, Colorado Springs, CO, Attorneys for Respondent.

Theresa Spahn, Executive Director, Nancy J. Walker–Johnson, Sheri Danz, Sarah Ehrlich, Denver, Colorado, Attorneys for Amicus Curiae The Colorado Office of Child's Representative.

Anne Kellogg, Aurora, Colorado, Attorney for Amicus Curiae The National Association of Counsel for Children.

Jeffrey C. Koy, Denver, Colorado, Attorney for Amicus Curiae Rocky Mountain Children's Law Center.

Colene Flynn Robinson, Denver, Colorado, Attorney for Amicus Curiae University of Colorado Law School Juvenile and Family Law Program.

Colorado Bar Association, William E. Walters, III, President, Denver, Colorado, Cox & Baker, LLC, Mary Jane Truesdell Cox, Denver, Colorado, Jacobs Chase LLC, Michael H. Berger, Denver, Colorado, Attorneys for Amicus Curiae Colorado Bar Association.

Justice COATS delivered the Opinion of the Court.

The People sought review of the court of appeals' judgment affirming two in *limine* evidentiary rulings of the district court in a prosecution for sexual assault on a child by one in a position of trust. *See People v. Gabriesheski*, 205 P.3d 441 (Colo.App.2008). Following the district court's exclusion of testimony concerning the recantation of the defendant's stepdaughter, the alleged child-sexual-assault victim, the prosecutor conceded her inability to go forward, and the case was dismissed. The court of appeals concluded that section 16–12–102(1), C.R.S.

(2010), gave it jurisdiction to entertain the People's appeal, but it affirmed both of the trial court's evidentiary rulings.

With regard to the exclusion of testimony by the guardian ad litem appointed in a parallel dependency and neglect proceeding, the court of appeals held that the child's communications with the guardian fell within the attorney-client privilege, as set out at section 13–90–107(1)(b), C.R.S. (2010). With regard to the exclusion of testimony by a social worker also involved in the dependency and neglect proceeding, the court found her to be both a professional who could not be examined in a criminal case without the consent of the parent-respondent, as dictated by section 19–3–207, C.R.S. (2010), and a licensed professional who could not be examined without the consent of her client, according to section 13–90–107(1)(g), C.R.S. (2010).

We conclude that the court of appeals did have jurisdiction to entertain the People's appeal, but we disapprove of its conclusions with regard to both of the trial court's evidentiary rulings. Because a child who is the subject of a dependency and neglect proceeding is not the client of a court-appointed guardian ad litem, neither the statutory attorney-client privilege nor ethical rules governing an attorney's obligations of confidentiality to a client strictly apply to communications by the child. Because the trial court apparently understood section 19–3–207 to bar the examination of the social worker in the defendant's criminal case as long as she qualified as a professional involved in the dependency and neglect proceeding, it failed to make sufficient findings to satisfy the additional statutory requirement that the statements at issue be ones made in compliance with court treatment orders, or to demonstrate the applicability of section 13–90–107, which is limited by its own terms to communications made by a client in the course of professional employment or psychotherapy.

The judgment of the court of appeals is therefore affirmed in part and reversed in part.

**I.**

Mark Gabriesheski was charged with two counts of sexual assault on a child by one in a position of trust. The charges arose from allegations by the defendant's sixteen-year-old stepdaughter to the effect that he had fondled her breasts and digitally penetrated her vagina on approximately fifteen occasions. A Petition in Dependency and Neglect was then filed in the juvenile court, designating the child's mother as the Respondent and the defendant as a Special Respondent. A guardian ad litem was appointed by the juvenile court, as required by statute.

Prior to trial the child recanted her accusations, and the prosecution gave notice of its intention to call as witnesses the guardian ad litem and a social worker who had apparently been assigned to act as caseworker in the juvenile proceeding. According to the prosecution's offer of proof, the guardian ad litem and social worker were crucial witnesses because they had knowledge of attempts by the mother to pressure her daughter to recant. The prosecutor indicated that the guardian would testify concerning a discussion with the child during which the child said it would make things easier for her if she admitted to lying about the sexual abuse and that it would make her mother happy if she simply said the abuse never occurred. The prosecutor represented that the social worker would testify regarding her own conversation with the mother, in which the mother asserted that the child made up the allegations in order to get back at her and the child's stepfather, and that the mother had a long talk with the child, in which she became angry and called the child a liar, and based on that discussion the child admitted to her, the mother, that she had fabricated the allegations.

The defense objected on the grounds that all communications between the child and guardian ad litem and all communications between the child and social worker were confidential and inadmissible in the absence of appropriate consent or waiver. The defense specifically argued that communications between the child and guardian ad litem were protected by the statutory

attorney-client privilege and duty of confidentiality imposed on attorneys by rule 1.6(a) of the Colorado Rules of Professional Conduct. It asserted that communications between the social worker and mother were privileged under subsections 13–90–107(1)(g), which prohibits the examination of certain enumerated treatment professionals concerning communications or advice given to clients in the course of professional employment, and were further made inadmissible by section 19–3–207(2), which prohibits the examination in a criminal case of professionals as to certain statements made by respondents in dependency and neglect proceedings.

The trial court ruled that neither the guardian ad litem nor the social worker would be permitted to testify at trial. It concluded that Colo. R.P.C. 1.6, in conjunction with Chief Justice Directive 04–06, imposed a duty of confidentiality on the guardian ad litem, which could only be waived by the child. Although it did not address Gabriesheski's assertion of a social worker-client privilege, the trial court also concluded that the social worker could not be examined in the criminal case without the consent of the child's mother for the separate reason that the social worker was a qualifying professional within the prohibition of subsection 19–3–207(2). In light of the trial court's rulings, the prosecution conceded its inability to go forward, and the court dismissed the charges, without prejudice. Following the dismissal of all charges, the prosecution filed a notice of appeal in the court of appeals, challenging the validity of both of the trial court's evidentiary rulings.

After rejecting the defendant's contention that it lacked jurisdiction to entertain the People's appeal, the appellate court affirmed both of the trial court's evidentiary rulings. With regard to the guardian ad litem, it upheld the trial court's ruling that communications by the child fell within the statutory attorney-client privilege. It reasoned that because Chief Justice Directive 04–06 sub-

jects guardians ad litem to "all of the rules and standards of the legal profession," it necessarily establishes an attorney-client relationship between the guardian and the minor child. With regard to the social worker, the appellate court upheld the trial court's finding that section 19–3–207 barred any examination of her in the criminal case but also found, despite the issue not having been addressed by the trial court, that the social worker-client privilege of section 13–90–107(1)(g), supported the conclusion that she could not testify without the consent of the child or her mother.

The People petitioned for a writ of certiorari, challenging the appellate court's conclusion concerning both evidentiary rulings. Although the defendant did not cross-petition with regard to the question of jurisdiction, in conjunction with granting the People's petition, we ordered the parties to brief the question whether the People's direct appeal following dismissal was authorized as the appeal of a question of law pursuant to section 16–12–102(1).

## II.

■ Public prosecutors in this jurisdiction are granted uncommonly broad authority to appeal decisions of trial courts in criminal cases upon questions of law. § 16–12–102(1), C.R.S. (2010) [1]; *People v. Guatney*, 214 P.3d 1049, 1050 (Colo.2009). Because this statutory authority, however, expressly requires that appeals under section 16–12–102(1) be filed and prosecuted as provided by the applicable rules of this court, we have previously made clear that appeals by the prosecution pursuant to this subsection are nevertheless subject to the final judgment requirement of C.A.R. 1. *See Guatney*, 214 P.3d at 1050; *Ellsworth v. People*, 987 P.2d 264, 266 (Colo. 1999); *People v. Gallegos*, 946 P.2d 946, 950 (Colo.1997). Although the statute expressly permits an immediate appeal of an order declaring a death penalty inoperative, regardless of any statute or court rule to the contrary, and specifically designates as suffi-

---

**1.** As relevant here, subsection 16–12–102(1) provides:

> The prosecution may appeal any decision of a court in a criminal case upon any question of

law.... The procedure to be followed in filing and prosecuting appeals under this section shall be as provided by applicable rule of the supreme court of Colorado.

ciently final for immediate appeal certain kinds of court orders, including orders dismissing a charge or granting a new trial, the finality requirement of C.A.R. 1 is satisfied with regard to any ruling or order of a district court once the action in which it was entered has produced a final judgment.

■ Although C.A.R. 1 makes no attempt to comprehensively describe what would constitute a final judgment for every kind of action, we have construed the term generally to refer to a judgment that ends the particular action in which it is entered, leaving nothing further for the court pronouncing it to do in order to completely determine the rights of the parties involved in the proceeding. *See Bye v. Dist. Court*, 701 P.2d 56, 61 (Colo.1985) (citing *D.H. v. People*, 192 Colo. 542, 544, 561 P.2d 5, 6 (1977); *People v. Cochran*, 176 Colo. 364, 490 P.2d 684 (1971)). For criminal cases, we have consistently held that a judgment comes when "the defendant is acquitted, the charges are dismissed, or the defendant is convicted and sentence is imposed." *Guatney*, 214 P.3d at 1051; *accord Sanoff v. People*, 187 P.3d 576, 577 (Colo.2008); *Gallegos*, 946 P.2d at 950. The dismissal of all charges in a criminal prosecution clearly ends the particular action in which the order of dismissal is entered and therefore constitutes a final judgment for purposes of the appellate review of any ruling in the case.

In *People v. Frye*, —— P.3d —— (Colo. App.2010), a different division of the court of appeals reached the opposite conclusion with regard to dismissals resulting from the failure of the prosecution to proceed. Largely by conflating finality for purposes of appellate review with limitations on any future prosecution of the defendant for the same conduct, the *Frye* division held that even a complete dismissal, as long as it results from either the unwillingness or inability of the prosecution to proceed to trial, does not constitute a final judgment from which an appeal of a question of law could be taken pursuant to section 16–12–102(1). *Id.* at ——. Relying largely on isolated language from an ancient treatise concerning the dismissal of charges at common law by a course of action formerly referred to as *nolle prosequi*, the division

misinterpreted a statement of this court that a *nolle prosequi* was not a final disposition of the case, *in the sense that* it would not bar future prosecution for the same offense, to mean that *because* the dismissal of charges at the request of the prosecution does not bar reinstatement of charges at some future date, it cannot produce a final judgment for purposes of appellate review. *Id.* at ——; *see Lawson v. People*, 63 Colo. 270, 274–75, 165 P. 771, 772–73 (1917) (quoting 10 Encyclopedia of Pleading and Practice 558 (1898)).

In fact, a careful reading of our reasoning in *Lawson* reveals that it is to precisely the opposite effect. There we held that a criminal defendant in a reinstituted prosecution had not already used up his limited statutory right to move for disqualification of the judge because "(w)hen the *nolle prosequi* was entered (initially dismissing all charges), that case was at an end," and upon refiling, a new case, in which the defendant had not yet exercised his right to seek disqualification, had begun. *Id.*, 63 Colo. at 275, 165 P. at 773. While we were not there concerned with the finality of a judgment for purposes of appellate review, we clearly held that refiled charges did not constitute a continuation of the earlier action against the defendant— an action which came to an end upon the dismissal of all charges in that case. *Id.* Similarly, in *People v. Small*, also relied on by the *Frye* division, we quoted the same passage to the effect that the "original indictment became a nullity upon its dismissal without prejudice," and at least where the prosecution acted in keeping with its duty to avoid putting the defendant in jeopardy on the basis of insufficient evidence, the reinstitution of identical criminal charges after acquiring new evidence did *not* amount to a continuation of the same action and therefore did *not* violate the defendant's constitutional right to a speedy trial. 631 P.2d 148, 154–55 (Colo.1981).

The requirement of the appellate rules for a final judgment is applicable to prosecutor appeals only to the same extent that it applies to all other appeals not expressly singled out by statute or rule. To conclude that the "finality" of a particular action turns on the moving party's motives or ability to initi-

ate some further action against the nonmoving party would not only significantly depart from the accepted meaning of the term itself but would·thwart the legislature's clear purpose in expressly permitting prosecutors to seek the judicial resolution of legal questions, without regard to the continued jeopardy of the defendant. Under such a regime, evidentiary rulings so injurious as to bar further ethical prosecution would not simply become immediately unreviewable. They would become unreviewable at any time.

Nor does our failure to read greater limitations into the final judgment requirement empower prosecutors to dangerously manipulate the courts and seek interlocutory appellate review at will, as feared by the *Frye* court. Quite apart from the ethical considerations involved in arguing for dismissal without prejudice due to the prosecution's inability to proceed, moving to dismiss as the result of an adverse evidentiary ruling will virtually always entail substantial risk that the defendant may never be prosecuted for the offense. Unless a public prosecutor feels that he can no longer prove the case against the defendant, and therefore can no longer ethically proceed, moving to dismiss a criminal prosecution is not an action to be taken lightly.

Although jeopardy will not yet have attached at the time of pre-trial rulings, the dismissal of all charges nevertheless precludes reliance on those charges for any continued infringement on the defendant's liberty. In addition to the practical problems associated with again acquiring jurisdiction over both the defendant and necessary witnesses within the applicable statutory limitations period, delay long enough for appellate review risks violating the defendant's constitutional right to a speedy trial by the loss of witnesses or other evidence important to his defense. *See Small,* 631 P.2d at 155–57. Depending upon the timing and actual impact of such an evidentiary ruling on the prosecutor's case, his *bona fides* in dismissing and refiling may well be challenged on due process grounds as an attempt to circumvent statutory speedy trial limitations or the trial court's refusal to grant a continuance. *See People v. McClure,* 756 P.2d 1008 (Colo.

1988)(and cases cited therein); *see also People v. Allen,* 885 P.2d 207 (Colo.1994). In any event, however, the defendant's susceptibility to further prosecution can only be determined when, and if, the prosecutor succeeds in reacquiring a right to the disputed evidence or otherwise acquires sufficient evidence for, and actually attempts, a second prosecution.

In addition, finality is far from the only limitation imposed on appeals by a prosecutor. The appeals authorized by section 16–12–102(1) are limited to questions of law implicated by actual decisions of criminal courts. *See People v. Ware,* 187 Colo. 28, 528 P.2d 224 (1974). While *in limine* evidentiary rulings may involve the construction of statutes or rules, or some similar question of law, a trial court's decision to admit or exclude evidence is not, in and of itself, an appealable question of law; and as this case demonstrates, resolution of even a properly postured question of law is unlikely to fully resolve the ultimate question of the admissibility of particular evidence.

Whether or not the issues presented by the prosecutor to the court of appeals below might also have been appealable according to different provisions of this statute, or according to different statutes or rules altogether, it is enough here that they posed questions of law and arose from decisions of a criminal court that had become final, within the contemplation of section 16–12–102(1) and C.A.R. 1.

### III.

■ Although a lawyer's ethical obligations not to reveal information relating to the representation of a client are governed in this jurisdiction by the Colorado Rules of Professional Conduct, *see* Colo. R.P.C. 1.6, the rules themselves expressly contemplate that external principles of substantive law must determine, in the first instance, whether an attorney-client relationship exists. *See* Colo. R.P.C., Preamble and Scope, para. 14. Similarly, while the evidentiary privilege protecting communications between attorney and client relating to legal advice is codified in this jurisdiction by statute rather than court rule, *see* § 13–90–107(1)(b), C.R.S.

(2010); *Wesp v. Everson*, 33 P.3d 191, 196 (Colo.2001); *Gordon v. Boyles*, 9 P.3d 1106, 1123 (Colo.2000), that statute makes no attempt to define the attorney-client relationship itself. Instead, we have held generally that a client is a person who employs or retains an attorney for advice or assistance on a matter relating to legal business, *People v. Morley*, 725 P.2d 510, 517 (Colo.1986), and an attorney-client relationship is established when it is shown that the client seeks and receives the advice of the lawyer on the legal consequences of the client's past or contemplated actions. *People v. Bennett*, 810 P.2d 661, 664 (Colo.1991); *Morley*, 725 P.2d at 517.

With regard in particular to the guardian ad litem and child for whom his appointment is statutorily dictated in all dependency and neglect proceedings, the statutes are equally silent as to the existence of an attorney-client relationship. *See* §§ 19–1–111 and 19–3–203, C.R.S. (2010). While all guardians ad litem appointed to serve in dependency and neglect proceedings must be credentialed as attorneys licensed to practice in the jurisdiction, § 19–1–103(59), and are statutorily assigned obligations usually associated with legal representation, like the examination of witnesses, they are ultimately tasked with acting on behalf of the child's health, safety, and welfare. *See* § 19–3–203. Rather than representing the interests of either the petitioner or respondents in the litigation, or even the demands or wishes of the child, the legal responsibility for whom is at issue in the proceedings, the guardian ad litem is statutorily tasked with assessing and making recommendations to the court concerning the best interests of the child. *See id.*

The Children's Code's general provision for the appointment of guardians ad litem delegates to the Chief Justice the authority to establish their duties and responsibilities in legal matters affecting children. *See* § 19–1–111(6). And while the applicable Chief Justice Directive clearly contemplates that such guardians ad litem may be performing functions touching on their professional obligations as lawyers, and therefore requiring their adherence to the Rules of Professional Conduct, *see, e.g.,* CJD 04–06 V. F., no more than the statutes themselves does it purport to designate an attorney-client relationship between a guardian ad litem in dependency and neglect proceedings and the child who is the subject of those proceedings. Even assuming that a directive of the Chief Justice, which is authorized under the Supreme Court's general superintending power over the state court system, *see Office of the State Court Admin. v. Background Info. Servs., Inc.,* 994 P.2d 420, 430–31 (Colo.1999); *Bye v. Dist. Court,* 701 P.2d 56, 59 (Colo.1985), might under some circumstance be an appropriate vehicle for creating an evidentiary privilege, CJD 04–06 nowhere suggests any intent to do so.

Nothing in the term "guardian ad litem," which on its face indicates merely a guardian for purposes of specific proceedings or litigation, suggests an *advocate* to serve as counsel for the child as distinguished from a *guardian,* charged with representing the child's best interests. *See generally* Black's Law Dictionary (9th ed. 2009) (quoting from Homer H. Clark, Jr. & Ann Laquer Estin, *Domestic Relations: Cases and Problems* 1078 (6th ed. 2000)). From the distinction between the two flow a series of important consequences, *id.,* implicating delicate policy choices potentially affecting, as this case clearly demonstrates, not only the best interests of the child but the criminal liability of others as well. In the absence of some clearer expression of legislative intent to do so, we are unwilling to impute to the statutory guardian ad litem-child relationship the legislatively-imposed, evidentiary consequences of an attorney-client relationship.[2]

For similar reasons, a number of other jurisdictions following a best-interests-of-the-

---

**2.** Contrary to the assertion of amici, our holding in *In re Marriage of Hartley*, 886 P.2d 665 (Colo. 1994), implies nothing to the contrary. Although we used the term "guardian ad litem" in reference to an attorney and his ethical obligations under the Rules of Professional Conduct in that proceeding under the Uniform Dissolution of Marriage Act, we made clear that we did so only to avoid confusion, where the parties had referred to the attorney by that term in their briefing. *See id.* at 667 n. 2. The attorney at issue in that case was clearly not a statutorily designated guardian ad litem under the Children's Code or any other statute of this jurisdiction.

child model have likewise declined to extend the attorney-client privilege and duties of confidence to this unique guardian ad litem-child relationship. *See, e.g.,* R.I. Gen. Laws § 15–5–16.2(c)(1)(iv)–(v) (2010) (communications between guardian ad litem and child not privileged, but still identifying child's best interests as focus of court's determination and guardian ad litem's duties); *In re Guardianship of Mabry,* 281 Ill.App.3d 76, 216 Ill.Dec. 848, 666 N.E.2d 16, 24 (1996) (citing child representation statute and holding no attorney-client privilege exists between guardian ad litem and ward because guardian ad litem's duty it to serve ward's best interests); *Ross v. Gadwah,* 131 N.H. 391, 554 A.2d 1284, 1285 (1988) (noting guardian ad litem represents child's interests and holding, "Communications between a guardian ad litem and a minor child are not privileged"); Alaska Bar Ass'n Ethics Comm., Ethics Op. 85–4 (1985) ("[T]he attorney is not bound by the normal duty of confidentiality, but rather should act within the context of the proceeding and be responsive to the reason for his appointment, namely the best interest of the child."); Ark. Sup. Ct. Admin. Order 15, Attorney Qualifications and Standards § 5(g) ("An attorney ad litem shall not be prevented by any privilege, including the lawyer-client privilege, from sharing with the court all information relevant to the best interest of the child."); Mass. Prob. & Family Ct. Standing Order 1–05, Standards for Guardians Ad Litem/Investigators §§ 1.3(c), 1.5 & cmt. (making clear child's best interests control and guardian ad litem should adhere to professional standards, but also that "[t]here is no attorney-client confidentiality").

Unlike the court of appeals, we therefore disapprove the trial court's ruling excluding the proffered testimony of the guardian ad litem as privileged pursuant to section 13–90–107(1)(b).

## IV.

■ We also agreed to review that portion of the court of appeals judgment approving the trial court's exclusion of any testimony by the social worker involved in parallel dependency and neglect proceedings. The trial court excluded the social worker's testimony solely for the reason that it understood section 19–3–207 to bar the examination, in any criminal case, of any professional involved in a dependency and neglect proceeding, unless the respondent in that proceeding consented.[3] Making clear that it considered a caseworker covered by the statute and that the respondent had not consented to the social worker's testimony, the court ruled that it would not permit the social worker to testify in the criminal case or permit any reference to her in the prosecutor's opening statement.

It appears that the trial court simply misread the applicable statute. On its face, section 19–3–207 bars no more than the examination of certain professionals without the consent of the respondent "as to statements made pursuant to compliance with court treatment orders...." The trial court's understanding of the statute was clearly mistaken, and its evidentiary ruling was therefore not supported by its articulated rationale. Quite apart from questions about the credentials of the caseworker in this case, the trial court failed to make any findings from which a reviewing court could determine whether the statements in question were made "pursuant to compliance with" treatment orders of the juvenile court.

By the same token, because the trial court did not rely on the licensed social worker-client privilege of section 13–90–107(1)(g) at all, it made no findings from which a social worker-client relationship between the social worker and the child, much less between the social worker and the declarant in this case, could be determined. In addition to addressing a question of law that was never the subject of a decision by the trial court, the court of appeals therefore presumed a factual predicate not established in the record.

Unlike the court of appeals, we therefore disapprove the trial court's reliance on section 19–3–207 as a basis for prohibiting examination of the social worker in the pros-

---

**3.** "And I think that is why 19–3–207 was enacted by the legislature and especially under subparagraph (2), it is pretty precise what it says: No professional shall be examined in any criminal case without the consent of the respondent.?" R. at 17.

ecution of the step-father. Should the mother's statements to the social worker become relevant in some future criminal prosecution, additional findings concerning their relation to the treatment orders of the juvenile court would be required to determine the applicability of section 19–3–207.

## V.

The judgment of the court of appeals is therefore affirmed in part and reversed in part.

Justice MARTINEZ dissents, and Chief Justice BENDER joins in the dissent.

Justice MARTINEZ, dissenting.

I respectfully dissent. Although I disagree with the majority's opinion in its entirety, I address the guardian ad litem issue first, because the majority's decision will have such a major negative impact on the juvenile justice system. As to the jurisdictional issue, I write separately in order to state my concern that the majority's decision will give the prosecution unlimited power to appeal any decision of a trial court simply by requesting a dismissal. Although I would hold that the court of appeals lacked jurisdiction to hear the appeal, I recognize that we can still address the guardian ad litem issue through our discretionary jurisdiction pursuant to Colorado Appellate Rule 21. Lastly, I address the majority's completely unnecessary decision to reverse the court of appeals on an aspect of an evidentiary question that was not even addressed by the parties.

## I. The Role of the Guardian Ad Litem

The majority's decision deprives children of the right to legal representation. In addition, the impact of this decision will have devastating effects on the ability of guardians ad litem to fully represent the best interests of children in dependency and neglect proceedings. Because children will no longer have the protection of the attorney-client privilege, guardians ad litem will be required

to disclose information about their wards even when it is not in the child's best interests to do so. This outcome, which appears to be based on a generalization that a child is incapable of being involved in the legal process, is at odds with a child's fundamental right to be represented in court, and fails to protect the legal rights of children. The majority's opinion ignores both our statutory language and the growing trend recognizing that children should be represented by lawyers acting in full accordance with legal ethical rules. The better outcome, and the one intended by our statutory scheme, recognizes the attorney-client privilege, but permits the guardian ad litem to decide whether to assert the privilege on behalf of the child.

The majority claims that Colorado's statutory scheme is silent about whether an attorney-client relationship exists between a guardian ad litem and a child in a dependency and neglect proceeding. From this assertion, the majority presumes that the correct course of action is to eschew any duty of confidentiality in order to avoid "creating an evidentiary privilege." This assumption is incorrect for two reasons: (1) Colorado's statutory scheme is not silent, but instead uses language evoking a hybrid role for a guardian ad litem; and (2) because guardians ad litem are required to be attorneys, and are explicitly required to comply with the rules of professional conduct, a standard that eschews attorney-client privilege and the duty of confidentiality is at odds with well-established principles.

In many jurisdictions, the laws governing guardians ad litem have been unclear about the role of confidentiality in the relationship between a guardian ad litem and a child. *See* Roy T. Stuckey, *Guardians Ad Litem As Surrogate Parents: Implications for Role Definition and Confidentiality,* 64 Fordham L.Rev. 1785, 1786, 1792 (1996). While some jurisdictions have required guardians ad litem to adhere to the traditional attorney-client privilege,[1] other jurisdictions have held that the privilege does not apply, liberally permitting disclosure of communications even

---

**1.** *See, e.g.,* Mich. Comp. Laws § 712A.13a(1)(c) (2011)("An attorney defined under this subdivision owes the same duties of undivided loyalty, confidentiality, and zealous representation of the child's expressed wishes as the attorney would to an adult client.").

without a waiver.[2]  Other states fall somewhere on the spectrum between privilege and no privilege, emphasizing the importance of confidentiality, but permitting disclosure under certain circumstances.[3]  The United States as a whole still reflects a lack of consensus as to the role of the guardian ad litem.  In fact, a 2005 study found that the United States has fifty-six individual systems of representation in place for children.  Jean Koh Peters, *How Children Are Heard in Child Protective Proceedings, in the United States and Around the World in 2005: Survey Findings, Initial Observations, and Areas for Further Study*, 6 Nev. L.J. 966, 968 (2006).  The trend, however, has been a growing consensus among scholars and practitioners that children should be represented by lawyers acting in full accordance with legal ethical rules.  *Id.* at 968–69.

### a.  Colorado's Statutory Language

Despite the majority's assertion that our laws are silent on the issue, Colorado's laws use language evincing adherence to both the traditional attorney-client privilege and a best-interests standard, under which the guardian ad litem would represent the best interests of the child.  For example, the statutory definition of a guardian ad litem is both someone who is appointed "to act in the best interests" of another person and an attorney who is "appointed to represent *a person* in a dependency and neglect proceeding." § 19–1–103(59), C.R.S. (2011) (emphasis added).  The dichotomy within this definition suggests that the guardian ad litem's duty is both to the child and to the best interests of the child.  The majority completely disregards Colorado's statutory definition of a guardian ad litem, and instead relies on a broad definition of a guardian ad litem extracted from Black's Law Dictionary.  As discussed above, the definition of a guardian ad litem varies widely from state to state and therefore,

Black's definition is not helpful in specifically ascertaining the intent of Colorado's legislature.  The statutory definition controls, and that language indicates a hybrid role for guardians ad litem in Colorado.

The statutory definition is not the only place in our law that acknowledges the unique role of the guardian ad litem.  The duties of the guardian ad litem are further described in section 19–3–203(3), C.R.S. (2011), which states that the guardian ad litem "shall be charged *in general* with the representation of the child's interests." (emphasis added).  The statute then enumerates the guardian ad litem's duties to investigate the facts, talk with the child, examine witnesses, make recommendations to the court concerning the child's welfare, and participate in proceedings to the degree necessary "to adequately represent the child."  Once again, within the same statute, the language suggests that a guardian ad litem represents both the child and the child's interests.  Moreover, while many of these responsibilities are typical duties of an attorney, because of the emphasis on representing and acting in the child's best interests, it is clear that a guardian ad litem is a special kind of attorney.

### b.  The Effect of Chief Justice Directive 04–06

To clarify the duties of the guardian ad litem, the legislature has delegated the establishment of more specific practice standards to the chief justice. § 19–1–111(6), C.R.S. (2011).  Chief Justice Directive 04–06 states, notably, that an attorney appointed as a guardian ad litem "shall be subject to all of the rules and standards of the legal profession...." C.J.D. 04–06(V)(B).  This directive also requires a guardian ad litem in a dependency and neglect case to provide accurate and current information directly to the court and to "[t]ake actions within the scope of his

---

**2.**  *See, e.g.,* Ark. Supreme Court Admin. Order No. 15.1: Qualifications and Standards for Attorneys Appointed to Represent Children and Parents, § 2(j) ("Attorney-client or any other privilege shall not prevent the ad litem from sharing all information relevant to the best interest of the child with the court.").

**3.**  *See, e.g.,* Minn. Rules of Guardian Ad Litem Procedure in Juvenile and Family Court, R. 905.01(c) (the guardian ad litem shall "maintain the confidentiality of information related to a case, with the exception of sharing information as permitted by law to promote cooperative solutions that are in the best interests of the child ...").

or her statutory authority and *ethical obligations* necessary to represent the best interests of the child." C.J.D. 04–06(V)(D)(1) & (3) (emphasis added). Therefore, this directive does not relieve a guardian ad litem from fulfilling his or her ethical obligations as an attorney. The majority downplays the significance of this directive, emphasizing instead that the directive does not, and potentially cannot, create an evidentiary privilege. This argument is misleading, however, because it rests on the false assumption that C.J.D. 04–06 is the source of the evidentiary privilege. C.J.D. 04–06 simply clarifies that an attorney appointed as a guardian ad litem in a dependency and neglect proceeding is required to act in full accordance with the rules governing attorney conduct. Attorney-client privilege applies as the result of the relationship between the attorney-guardian ad litem and the child, created by statute.

### c. The Attorney–Client Relationship

The majority concludes that a guardian ad litem represents the child's best interests, but not the child, because to hold otherwise would impose the evidentiary consequences of an attorney-client relationship onto the statutory guardian ad litem-child relationship. Thus, without discussion or analysis, the majority presumes that a child who is the subject of a dependency and neglect proceeding is not the client of a court-appointed guardian ad litem. I disagree, and would instead conclude that the child is the client of the guardian ad litem, and that, therefore, attorney-client privilege applies.

An attorney-client relationship "may be inferred from the conduct of the parties." *People v. Bennett,* 810 P.2d 661, 664 (Colo. 1991). In determining whether an attorney-client relationship exists, we apply a subjective test, of which an important factor is "whether the client believes that the relationship existed." *Id.* As the majority noted, we have held that a client is a person who employs or retains an attorney for advice or assistance on a matter relating to legal business. *People v. Morley,* 725 P.2d 510, 517 (Colo.1986). Although we have not explicitly addressed the present situation, in other contexts, we have not made the existence of an

attorney-client relationship contingent on whether counsel was retained by the defendant or the court. *People v. Harlan,* 54 P.3d 871, 878 (Colo.2002) ("[O]nce counsel is appointed, the attorney-client relationship is no less inviolable than if the counsel had been retained by the defendant.'" (quoting *People v. Isham,* 923 P.2d 190, 193 (Colo.App. 1995))). Accordingly, the fact that a guardian ad litem is appointed by the court, rather than sought out by the child, is not a dispositive factor in determining whether the attorney-client relationship exists. Instead, we must look to statutes, the conduct of the parties, and the subjective belief of the child.

Although our statutory language requires the guardian ad litem to represent the best interests of the child, this does not necessitate a conclusion that there is no attorney-client relationship between a child and an appointed guardian ad litem. In other areas of Colorado's domestic relations law, the General Assembly has used similar "best-interests" language even when it is clear that an attorney is appointed to serve as the legal representative of the child. For example, in a custody proceeding, the court has the discretion to appoint a child's representative. § 14–10–116(1), C.R.S. (2011). The child's representative serves as the "legal representative of the child," but also represents the "best interests of the child." Like the guardian ad litem in a dependency and neglect case, the child's representative is required to be an attorney and to comply with all the provisions of the Colorado rules of professional conduct. This duty is described both in section 14–10–116 and in C.J.D. 04–06(V)(B). In contrast, a child and family investigator may be appointed in a custody proceeding to serve as the "investigative arm of the court." C.J.D. 04–08(IV)(B)(3). While the investigator may be an attorney, he or she is not permitted to provide legal advice or act as a lawyer, and is not required to comply with the rules of professional conduct for attorneys. C.J.D. 04–08(IV)(B)(4). The same person may not serve as both the child's representative and the family investigator. § 14–10–116.5(1), C.R.S. (2011).

The contrast between the role of child's representative and investigator highlights

the difficulty of rectifying a guardian ad litem's varying responsibilities with the obligation to adhere to legal ethical standards. The contrast also demonstrates, however, that the General Assembly may use the "best interests" language even when it intends for an attorney to represent a child in an attorney-client relationship. The language in the guardian ad litem statute more closely resembles the language describing the child's representative, particularly in light of the express requirement that the guardian ad litem adhere to the legal rules of professional conduct. Accordingly, I would hold that the statutory language requires a conclusion that an attorney-client relationship exists between a child and a guardian ad litem in a dependency and neglect proceeding, and that the guardian ad litem represents both the child and the child's best interests.[4]

The conduct of the parties further confirms my conclusion that the attorney-client relationship exists. When a dependency and neglect petition is filed, it means that there is reason to believe that the child's parents are not acting in the child's best interests. The guardian ad litem steps into the shoes of the parents, acting on behalf of the parents in pursuit of the best interests of the child. In Colorado, however, the guardian ad litem is also required to be an attorney and perform typical duties of an attorney in court. Both of these roles make it essential for the guardian ad litem to earn the child's trust. The consensus among academics and practitioners is that the duty of confidentiality enhances the representation because it encourages full disclosure from the child, which may lead to the discovery of information which would not otherwise come to light. *See, e.g.,* Gail Chang Bohr, *Ethics and the Standards of Practice for the Representation of Children in Abuse and Neglect Proceedings,* 32 Wm. Mitchell L.Rev. 989, 1002–03 (2006). Furthermore, when a child confides in a guardian ad litem attorney, the child most likely expects confidentiality, because the child has no other legal representative.

I recognize that there may be times where it would be in the best interests of a child to reveal information to the court, but the child does not consent to disclosure. In my view, the guardian ad litem in a dependency and neglect proceeding is bound by the attorney-client privilege and the duty of confidentiality, but the guardian ad litem, acting in the child's best interests, decides whether to invoke the privilege on behalf of the child. In this way, both the child's legal rights and best interests are represented by an attorney. In determining whether to reveal a communication without the child's consent, the guardian ad litem should, as a good parent would, speak with the child first and consider the child's wishes. Additionally, the guardian ad litem should take into account the age and maturity of the child in making its determination. While a guardian ad litem for a younger child will likely make most or all of the decisions, a guardian for an older mature child might function more like an attorney for an adult, allowing the child to play a larger role in the decision-making.

I would hold that the attorney-client privilege does apply to confidential communications made between a guardian ad litem and a child in a dependency and neglect proceeding, and that the responsibility to decide whether to assert the privilege on behalf of the child is placed with the guardian ad litem.

## II. Jurisdiction

I also dissent from the majority's holding that a dismissal for failure to prosecute constitutes a final judgment for purposes of appeal. The majority's holding gives the prosecution unlimited power to appeal any decision of a trial court simply by requesting a dismissal. The majority justifies this result by claiming that the prosecution will always make the correct ethical judgment about when to dismiss a case. In my view, the General Assembly did not intend to give the prosecution the unchecked right to appeal an otherwise unappealable interlocutory order. Instead, the General Assembly enact-

---

4. In lieu of this dual-role, children could be represented by both an attorney and a guardian ad litem in every dependency and neglect proceeding, but such an outcome strains scarce resources.

ed the amendment to section 16–12–102(1), C.R.S. (2011), to prevent double jeopardy issues when *the court* dismissed or reduced a charge. Therefore, I would hold that, because a dismissal for failure to prosecute is not a final order, it cannot be the basis for an appeal under section 16–12–102(1).

The legislature has specified that a final order includes a pre-trial dismissal of at least one count of a charging document, but in order to serve as the sole basis for an appeal, the dismissal must also satisfy the final judgment rule. *See People v. Guatney*, 214 P.3d 1049, 1050 (Colo.2009). Therefore, the dismissal must leave nothing further for the court to do in order to completely determine the rights of the parties with regard to the dismissed charges. *Id.* at 1051. Because a dismissal for failure to prosecute does not satisfy the definition of a final judgment, it cannot be considered the type of final order contemplated by the statute.

The distinction lies in the reason behind the dismissal. When a court dismisses a charge on its own cognizance, such as for a lack of probable cause, the dismissal is a final judgment because the dismissing court has nothing further to do regarding those charges. As a result, the prosecution is left with no other choice but to go forward on any remaining charges or appeal. If the prosecution does not appeal, the opportunity to prosecute the dismissed charge is lost completely due to double jeopardy concerns. In contrast, when a pre-trial dismissal is caused by a failure to prosecute, the prosecution may simply refile the charges at a later time. Consequently, there could be something further for the dismissing court to do, and so long as refiling is a possibility, the rights of the parties with regard to those charges cannot be said to have been completely determined. Therefore, a dismissal for failure to prosecute is distinct from a dismissal initiated by the court.

Although prosecutors in Colorado are granted uncommonly broad authority to appeal, this power is not supposed to be unlimited, as the majority's holding would make it. The legislative history is consistent with the notion that section 16–12–102(1) was not meant to provide appellate review of evidentiary rulings underlying a dismissal order for failure to prosecute. In 1998, section 16–12–102(1) was amended to add that any order dismissing one or more counts of a charging document prior to trial shall constitute a final appealable order. Ch. 251, sec. 9, § 16–12–102, 1998 Colo. Sess. Laws 948. The amendment was proposed in response to the *Gallegos* case, in order to clear up confusion on the issue of whether an appeal would be allowed of an order that dismissed one or more, but not all charges at a preliminary hearing. *Hearing on H.B. 1088 Before the S. Judiciary Comm.*, 1998 Leg., 2d Regular Sess., 61st Gen. Assemb. (Colo. 1998) (referring to *People v. Gallegos*, 946 P.2d 946 (Colo.1997)). The hypothetical situation discussed during the committee hearings involved a first degree murder charge dismissed or reduced to second degree *by the court* at a preliminary hearing. Without the right to appeal at that stage, the case would go forward on the second degree charge and jeopardy would attach, making it impossible for the prosecution to ever appeal the reduction or dismissal of the original charge. Based on this example, it is clear that the General Assembly intended to make a dismissal of charges appealable when the court initiates the dismissal over the objection of the prosecution. Conversely, the amendment was not intended to give the prosecution the authority to dismiss charges and then challenge, not the order of dismissal, but any ruling made by the trial court, even those which would ordinarily be unappealable. Therefore, I conclude that section 16–12–102(1) does not permit an appeal of a dismissal for failure to prosecute.

When a prosecutor requests a dismissal, the court's discretion to withhold consent and approval is extremely limited. For example, this court has held that "a trial court's refusal to grant a prosecutor's request to dismiss a charge was an abuse of discretion absent [clear and convincing] evidence that the prosecutor was attempting to harass the defendant or prejudice his defense." *People v. Frye*, —— P.3d ——, —— (Colo.App.2010) (selected for official publication) (citing *People v. Lichtenstein*, 630 P.2d 70, 73 (Colo. 1981)). Thus, when a court dismisses a case

for failure to prosecute, it is essentially performing a ministerial function at the behest of the prosecution.

By allowing a dismissal for failure to prosecute to serve as the basis of an appeal, the majority is "transform[ing] the trial court's essentially ministerial role in approving a prosecution's request for dismissal into the means for gaining an appeal of right of what is, in essence, an interlocutory order of a kind not appealable under the interlocutory appeal provisions of section 16–12–102(2)...." *Id.* at —— (citing cf. *People v. Donahue*, 750 P.2d 921, 922–23 (Colo.1988) (suppression orders are appealable by interlocutory appeal, not by voluntarily dismissing the case and appealing on a "question of law")). In other words, it gives the prosecution a way to get around the limitations on interlocutory appeals by merely requesting that the charges be dismissed and then appealing.

The majority's mistaken approach makes the scope of appellate review entirely coterminous with the strategy and tactics of prosecutors. While the majority notes that the decision to request dismissal should not be taken lightly, appealability should not hinge on the majority's purported confidence that strategic and tactical decisions of each individual prosecutor will be properly constrained by their ethical standards. Accordingly, I would hold that section 16–12–102(1) may not be used as a basis for appellate jurisdiction when the only alleged final order is a dismissal for failure to prosecute.

### III. Social Worker Testimony

Lastly, I dissent from the majority's conclusions regarding the testimony of the social worker. In disapproving of the trial court's reliance on section 19–3–207, C.R.S. (2011), as a basis for prohibiting examination of the social worker, the majority has gone out of its way to reverse the court of appeals on an issue that was never addressed by the parties or the trial court. The majority dwells on the lack of findings regarding the existence of the social-worker-client relationship and the question of whether the statements were made pursuant to compliance with treatment orders. However, the parties did not even argue about these issues. Because the prosecution implicitly conceded that the relationship existed and that the statements were made pursuant to compliance with treatment orders, the parties and the court of appeals focused on whether the proposed statements fall under the exception to the privilege.

Section 19–3–207(2) prohibits the testimony of any treating professional involved in a dependency and neglect case, but makes an exception for discussions of future misconduct or past misconduct *unrelated to the allegations* involved in the treatment plan. The People sought to admit testimony of the social worker which would suggest that T.W.'s mother had pressured T.W. to recant the allegations of sexual abuse.

I agree with the court of appeals that the statements cannot be said to be "unrelated to the allegations" of sexual abuse, because the proposed testimony goes "directly to the veracity of the allegations," and would not fall under the exception to the privilege. *People v. Gabriesheski*, 205 P.3d 441, 444 (Colo.App. 2008). Therefore, although the exact statements at issue were not in the record before us, the description of the proffered testimony provides sufficient information to determine that the trial court did not abuse its discretion in excluding the testimony.

Likewise, the court of appeals did not err when it concluded that section 13–90–107(1)(g), C.R.S. (2011), serves as an additional ground for precluding the testimony. Section 13–90–107(1)(g) prohibits a social worker from being examined without consent, as to any communication made by the client in the course of professional employment. The parties argued the applicability of this statute before the trial court, but because the trial court decided to exclude the social worker's testimony based on section 19–3–207, the trial court did not address section 13–90–107 in its ruling.

The majority complains that the court of appeals should not have addressed section 13–90–107 because the trial court did not make findings regarding the existence of the social-worker-client relationship. The court of appeals merely noted that section 13–90–107 further supports the conclusion that the

social worker could not testify. Because neither the trial court nor the court of appeals relied on 13–90–107, and because the plain language of the statute supports the conclusion that the social worker's testimony was inadmissible, the majority's decision to remand for additional findings on the existence of the social-worker-client relationship is completely unnecessary.

For the reasons described above, I respectfully dissent.

I am authorized to state that Chief Justice BENDER joins in this dissent.